Dale OSBORN, individually and on behalf of all others similarly situated in the County of New Castle, State of Delaware, Plaintiff,

v.

The PENNSYLVANIA–DELAWARE SERVICE STATION DEALERS ASSOCIATION, a corporation, and each of their respective members, the names of which are presently unknown, located within the geographical area of New Castle County of the State of Delaware; The Secretary of the United States Department of Energy and The United States Department of Energy, Defendants.

Civ. A. No. 79–355.

United States District Court, D. Delaware.

Sept. 11, 1980.

William J. Wier, Jr., John Merwin Bader, and Terry C. Seningen, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., Robert P. Weiner, of Zarwin, Baum, Arangio & Ross, Philadelphia, Pa., for defendant Pennsylvania–Delaware Service Station Dealers Association.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., C. Max Vassanelli, and William G. Cole, U. S. Dept. of Justice, Washington, D. C., for defendants Secretary of the United States Department of Energy and The United States Department of Energy.

## OPINION

STAPLETON, District Judge:

The named plaintiff, Dale Osborn, initiated this antitrust action against the Pennsylvania–Delaware Service Station Dealers Association (the "Dealers"), the United States Department of Energy (the "DOE") and the Secretary of the DOE. He sues on

behalf of all those who regularly purchase gasoline from one or more of the Dealers within New Castle County, Delaware, and who have been or will be injured by the Dealers' alleged conspiracy to cause the DOE to raise the maximum price at which gasoline can be sold at retail throughout the United States. Plaintiff asserts that in order to bring public pressure to bear on the DOE in support of this objective, the Dealers planned and executed a group boycott of gasoline sales to the public. Pursuant to this alleged agreement between them, the Dealers closed their pumps down on July 13, 1979 and did not resume selling until several days later when the DOE increased the maximum retail price of gasoline. *See* 10 C.F.R. § 212.93; 44 Fed.Reg. 42541–45, July 19, 1979.

Plaintiff claims that the Dealers' activities are in violation of Sections 1 and 2 of the Sherman Act and Sections 3, 4 and 15 of the Clayton Act (15 U.S.C. §§ 1, 2, 14, 15, 25). He seeks treble and punitive damages, reimbursement for the expenses of prosecuting this action, and an injunction against future illegal conduct by the Dealers. The federal defendants are included in this action because plaintiff seeks to enjoin the implementation by the DOE of "the illegal gasoline price increase improperly implemented solely in response to the illegal conspiracy."

Currently before the Court are the Dealers' and federal defendants' motions to dismiss for failure to state a claim upon which relief can be granted. Additionally, the Dealers assert that even if plaintiff does state a valid claim for relief, this claim cannot be maintained as a class action. For the reasons outlined below, I have concluded that while the federal defendants' motion to dismiss will be granted, the Dealers' motion must be denied. A decision regarding the appropriateness of class certification in this case has been postponed to permit further briefing.

## I. THE CLAIM AGAINST THE DEALERS.

The Supreme Court first considered the relationship between the First Amendment right "to petition the Government for a redress of grievances" and the enforcement of our antitrust statutes in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). It further defined that relationship in *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and, more recently, in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In *Noerr*, the Court held that a complaint alleging that certain railroads had initiated a deliberately false publicity campaign in order to promote the "adoption and retention of laws and law enforcement practices destructive of the trucking business . . . and to impair the relationships between the truckers and their customers," 365 U.S. at 129, 81 S.Ct. at 525, did not state a cause of action under the Sherman Act. Justice Black, writing for the Court, refused to attribute to Congress an intent to regulate political activity designed to influence the passage or enforcement of legislation. 365 U.S. at 139–40, 81 S.Ct. at 530–531. Such a construction, he indicated, had no support in the legislative history of the Act, and "would raise important constitutional questions." 365 U.S. at 138, 81 S.Ct. at 530.

Additionally, the Court held that the immunity of political expression does not depend on the motives of those involved, 365 U.S. at 139–40, 81 S.Ct. at 530, thus, the conduct at issue in *Noerr* was protected from antitrust liability despite the anti-competitive goal of the railroads' collaboration. The Court did observe, however, that situations might arise in which anti-competitive activity ostensibly directed toward influencing government policy could be shown to be "a mere sham to cover what is actually nothing more than attempt to interfere directly with the business relationships of a competitor," 365 U.S. at 144, 81 S.Ct. at 533, and the application of the Sherman Act would, therefore, be justified.

*United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14

L.Ed.2d 626 (1965) involved a claim brought by a small mining company against the U.M.W., larger companies, and the Secretary of Labor, alleging a conspiracy to drive small mining operations out of business. This objective was allegedly to be accomplished through various anti–competitive practices of the Union, and through joint lobbying of the Secretary of Labor designed to secure policies unfavorable to small mine owners. While the agreement between the U.M.W. and the large operators to adopt anti–competitive labor practices was held to be an appropriate basis for antitrust liability, the Court stated that:

> Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

381 U.S. at 670, 85 S.Ct. at 1593.

The Court applied the sham exception to *Noerr's* general rule in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). It was alleged in this case that a group of trucking companies had engaged in a joint campaign of administrative and judicial harassment to prevent a rival corporation from obtaining operating rights. The Court ruled that this behavior was not a genuine attempt to influence government policy, but rather constituted a direct interference with the business relationships of a competitor by denying him meaningful access to the agencies and courts. 404 U.S. 515–16, 92 S.Ct. 614.

Defendants apparently read *Noerr* and *Pennington* as conferring an exemption from antitrust liability upon all activities that are aimed at influencing governmental action. This reading has the virtue of simplicity, but its adoption would require courts to sanction conduct that severely restricts competition even when there is a minimal threat to First Amendment values. I believe the Supreme Court did not intend such a doctrinaire approach to the resolution of conflicts between society's interest in nurturing competition and its interest in assuring effective communication between the citizenry and their government.

■ The starting point for analysis is a recognition that, in this area, the boundaries of the antitrust laws abut those of the First Amendment. While the Court framed its holdings in *Noerr* and *Pennington* in terms of statutory construction, *California Motor Transport* indicates that the antitrust exemption recognized in these earlier cases is predicated upon the First Amendment:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis–a–vis* their competitors.

404 U.S. at 510–11, 92 S.Ct. at 612. Thus, the scope of the *Noerr* exemption is properly defined by reference to the scope of protection afforded by the First Amendment.

■ The objective of the "right to petition" clause is not merely to guarantee the opportunity for seeking redress. As *Noerr* itself suggests, it is also designed to provide some assurance that public decision–makers will be sufficiently informed to carry out their function. Thus, the right to petition shares with other First Amendment rights a focus on the importance of maintaining a free flow of ideas. As the Supreme Court observed in *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945):

> It is . . . in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identi-

cal, are inseparable. They are cognate rights, cf. *DeJonge v. Oregon*, 299 U.S. 353, 364 [57 S.Ct. 255, 259, 81 L.Ed. 278], and therefore are united in the First Article's assurance. Cf. 1 Annals of Congress 759–760.

The common focus of these "cognate" First Amendment rights suggests that in the absence of definitive precedent applying the right to petition clause, we may look to free speech jurisprudence for guidance in predicting the future course of the *Noerr* doctrine.[1]

▮▮▮ In applying the free speech clause, the Supreme Court has distinguished between government control of the marketplace of ideas and government control of conduct which, though having a communicative component, poses a threat to the public interest independent of the idea expressed. Where government regulation is directed to the suppression of thoughts or ideas, it is permissible only when the message being suppressed poses a clear and present danger[2] or falls within one of the few other categories singled out by the Court as "unprotected" speech.[3] On the other hand, regulation aimed at the non–communicative impact of expressive conduct will be sustained if the state interest served is sufficiently strong to justify any incidental constriction of the flow of ideas. As the Supreme Court observed in *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) "when speech and non–speech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non–speech element can jus-

tify incidental limitations on First Amendment freedoms so long as that interest "is unrelated to the suppression of free expression." 391 U.S. at 376–77, 88 S.Ct. at 1678.

Application of the antitrust laws to the advertising campaign in *Noerr* would have involved government control of the marketplace of ideas. The effect upon expression would not have been content neutral; liability would have been imposed on the basis of the anti–competitive nature of the message conveyed. The free speech case law suggests that the refusal of the Supreme Court to apply the antitrust laws in *Noerr* will not be considered controlling in a context where the effect of the application of those laws would be content neutral, would not materially inhibit effective expression, and would alleviate the coercive economic impact of a concerted refusal to deal. It would be one thing, for example, to say that United States automakers have a right to seek, and promote public support for, higher tariffs; it would be quite another to sanction an agreement between Ford, GM and Chrysler that they will market no new cars until the government provides some protection against foreign imports. While I do not suggest that the alleged boycott in this case has the same anti–competitive potential as the hypothesized one, the point is that a boycott, along with its communicative component, has a coercive economic effect which ordinarily may be regulated without serious jeopardy to First Amendment interests.[4]

▮▮▮ The question posed by defendants' motion is whether the right to petition requires a blanket antitrust immunity for

---

1. Fischel, "Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the *Noerr–Pennington* Doctrine," 45 Chi.L.Rev. 80, 100 (1977).

2. The First Amendment does not preclude government suppression of speech "which is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam).

3. The Court has held that the First Amendment does not protect "fighting words," obscene ma-

terials, or malicious defamation. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("fighting words"); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (defamation).

4. *See* Note, "Protest Boycotts Under the Sherman Act," 128 U.Pa.L.Rev. 1131, 1144–48 (1980); Note, "Political Boycott Activity and the First Amendment," 91 Harv.L.Rev. 659, 683–87 (1978).

boycotts that are intended ultimately to influence governmental action. Applying the Supreme Court's current First Amendment analysis, I conclude that no such immunity should be afforded. The Supreme Court has repeatedly held that the government has a strong interest in regulating anti–competitive activity.[5] Moreover, it has repeatedly recognized that joint refusals to deal, as a class, possess great anti–competitive potential.[6] The Sherman and Clayton Act take cognizance of that hazard and purport on their face to regulate such conduct in a manner that is unrelated to the suppression of free expression. If a boycott designed to influence governmental action has produced an anti–competitive effect of the kind those acts were intended to guard against, it seems to me that relief can ordinarily be granted with little threat to First Amendment values. Conceivably, there may be situations in which application of those acts to such a boycott would substantially impair the participants' ability to be heard, but this possibility does not require an across–the–board antitrust immunity and nothing currently in the record suggests that this is such a situation.

It is, of course, true that boycotts designed to influence governmental action are likely to follow other patterns and have other effects than more conventional forms of joint refusals to deal. As defendants point out, if there has been any anti–competitive effect from the Dealers' boycott in this case, it will not be of the kind found in the typical boycott case where the defendants have attempted to exclude horizontal competitors by denying them a trade rela-tionship essential to their survival. These observations argue persuasively against applying the line of *per se* liability boycott cases to this distinct form of boycott without further economic analysis.[7] They do not, however, provide a persuasive reason for implying a blanket immunity for this form of economic activity.[8]

## II. THE CLAIMS AGAINST THE FEDERAL DEFENDANTS.

■ The federal defendants urge that sovereign immunity requires their dismissal from the case. I do not agree. Title 5, United States Code, Section 702, as amended by Congress in 1976, provides:

. . . An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

. . .

As the Court of Appeals for the Third Circuit observed in *Jaffee v. United States*, 592 F.2d 712 (1979), this statute means precisely what it says.

■ I agree, however, that plaintiff has failed to state a claim against the federal defendants upon which relief can be granted. It is important at the outset to isolate the predicate for the purported claim against these defendants. It is *not* alleged

---

5. See, e. g., *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

6. See, e. g., *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

7. When such "classic" group boycotts are not the issue, lower courts have frequently decided boycott cases on the basis of rule–of–reason analysis. See, e. g., *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C. Cir. 1978); *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530 (5th Cir. 1975), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2nd Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

8. The conclusion which I reach is inconsistent with that reached by the Eighth Circuit in *State of Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301 (1980). As I read the majority opinion in that case, an antitrust immunity would be available or not depending upon whether the motivation in seeking government action is "political" or "economic". I believe such a rule to be both incapable of application and inconsistent with First Amendment case law.

that the DOE lacks statutory authority to fix a ceiling price for the retail sale of gasoline or that it is not authorized to set the particular rate fixed in this instance. Moreover, it is not claimed that the decision was arbitrary or capricious or that the rule making proceedings were in any way procedurally deficient. Finally, there appears to be no assertion that the federal defendants violated the antitrust laws in any way.[9] As I understand it, however, plaintiff does claim that the DOE's new ceiling price must be stricken down and the preceding ceiling price reinstated because the decision to raise the ceiling price was a product of an illegal boycott.[10] Thus, the question posed is whether effective enforcement of the antitrust laws requires that governmental action be invalidated whenever a court concludes that the political process which culminated in its adoption was substantially affected by conduct violative of the antitrust law. I conclude that such an extraordinary remedy would seriously hamper the exercise of legitimate governmental power and is not necessary to effectuate our antitrust statutes.

■ A rule permitting the relief which the plaintiff here seeks would necessarily involve the courts in difficult and complex evaluations of causation. A court undertaking such an evaluation would be required first to determine whether the anti-competitive conduct was responsible for the existence of some measure of public pressure, and then decide whether this pressure was the "cause" of the disputed agency's action. Because the determinants of public opinion are by nature multivariate and amorphous, and because a court could never be certain that an agency would not have taken the same action in the absence of the public pressure, any finding of a direct connection between the alleged anti-competitive conduct and governmental action would necessarily be speculative and conjectural. While uncertainty in the resolution of questions of causation does not ordinarily counsel against addressing them, when the task is as difficult as it is in this context, and the price of erroneous determinations is as high in terms of frustration of governmental policy,[11] our judicial system is well advised to defer in favor of other remedies which entail less risk. Our courts are, of course, empowered to enjoin the anti-competitive private conduct which is alleged to be the source of the taint, leaving the executive branch free to evaluate or reevaluate the substantive issue free of that taint, subject to judicial review of its determination by traditional standards of the Administrative Procedure Act. Neither reason nor precedent suggest to me that this is an inadequate remedy.[12] The motion of the federal defendants will, accordingly, be granted.

### III. CLASS CERTIFICATION.

■ In conjunction with its motion to dismiss for failure to state a claim upon which relief can be granted, defendant Dealers also assert that plaintiff's claims,

---

9. *Compare Duke & Company, Inc. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975). *Duke* held that an antitrust cause of action is stated against government officials when it is alleged that they conspired with private individuals to restrain trade. It is not alleged in this case that the federal defendants so conspired with the Dealers.

10. Plaintiff cites *Sabin v. Butz*, 515 F.2d 1061 (10th Cir. 1975) to support this view. *Sabin*, however, involved an allegation that the Forest Service violated its governing statute by conferring a monopoly on ski instruction for certain public lands. 515 F.2d 1069. The Tenth Circuit's holding that this allegation states a cause of action has no relevance to the instant case because the DOE is expressly authorized by Congress to set retail price ceilings for the sale of gasoline. 42 U.S.C. § 7112(2) and (3); 15 U.S.C. § 753(a) and (b)(2)(C).

11. In the case at bar, for example, the DOE justified its regulations, *inter alia*, on the need to prevent the "severe disruptions and imbalances in the supply and distribution of motor gasoline [that] could develop in the coming months" without the price increase. 44 Fed. Reg. 42544 (July 19, 1979).

12. Plaintiff did not seek a restraining order or preliminary injunction presumably because the boycott had terminated before the action was instituted.

even if legally sufficient, are not maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiff has to some degree addressed the merits of these arguments, but claims that such a response is unnecessary because defendants' objections are "premature". Plaintiff's briefing appears to incorrectly assume that defendants to purported class actions may only raise issues regarding the appropriateness of this procedure in response to class certification motions. Nothing in the language or logic of Rule 23(c) suggests this conclusion. To the contrary, the Rule dictates that the Court shall pass on the maintainability of a class action "[a]s soon as practicable . . ." *See Jenkins v. General Motors Corporation*, 354 F.Supp. 1040 (D.Del.1973) (ruling on appropriateness of purported class action while deciding motions to dismiss).

Nevertheless, in determining the Rule 23(b)(3) issues of the predominance of common over individual questions of law or fact and the superiority *vel non* of the class action procedure, the Court needs further help from the plaintiff, namely: (1) a precise definition of the proposed class he seeks to represent; (2) a specifications of the damages he maintains the members of the class will be entitled to if liability is established and the method to be used in allocating such damages to the individual class members. I ask that plaintiff provide this help within two weeks of the issuance of this Opinion. The remaining defendant may have one week thereafter to respond.