SUPERIOR COURT TRIAL LAWYERS
ASSOCIATION, et al., Petitioners,

v.

FEDERAL TRADE
COMMISSION, Respondent.

No. 86–1465.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1987.

Decided Aug. 26, 1988.

tal's application, constituted a "final order" un- der § 401(c). *See* maj. op. at 216.

Donald I. Baker, of the bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of Court, with whom Willard K. Tom, Douglas E. Rosenthal, Willis B. Snell, Michael L. Denger, David T. Shelledy and W. Todd Miller were on the brief, for petitioners.

Ernest I. Isenstadt, Asst. Gen. Counsel, F.T.C., with whom Karen G. Bokat, Atty., F.T.C., was on the brief, for respondent.

Gerald P. Norton, Jo Ann Abramson, Arthur B. Spitzer and Elizabeth Symonds were on the brief for The American Civil Liberties Union Fund of the National Capital Area, Amicus Curiae, urging reversal.

Marc Gary and Patricia A. McCoy were on the brief for Washington Council of Lawyers, et al., Amici Curiae, urging reversal.

Before ROBINSON, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Concurring opinion filed by Circuit Judge SILBERMAN.

D.H. GINSBURG, Circuit Judge:

We are called upon to review a determination by the Federal Trade Commission that petitioners, the Superior Court Trial Lawyers Association and four individual member attorneys, Ralph J. Perrotta, Karen E. Koskoff, Reginald G. Addison and Joanne D. Slaight, (hereinafter collectively SCTLA) violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1982), by organizing and participating in a concerted refusal to deal or "boycott" aimed at forcing the District of Columbia government to increase the hourly compensation paid to attorneys who represent indigent defendants in criminal cases before the District of Columbia Superior Court. The Commission concluded that the boycott constituted an "unfair method of competition" and entered an order requiring the petitioners to cease and desist from similar conduct in the future.[1] For the reasons stated below, we grant the petition for review, in part, and remand to the Commission to determine whether SCTLA had the market power necessary for the boycott to violate Section 5.

---

1. *See In re Superior Court Trial Lawyers Association, et al.,* Opinion of the Commission, 107 F.T.C. 562 (1986), hereinafter referred to as "FTC Decision." The Initial Decision of the Administrative Law Judge will be referred to as "I.D." and the numbered findings in that decision will be referred to as "I.D.F. ___." Citations to testimony and exhibits in the record will refer to the Joint Appendix (JA) filed in this court by the parties.

## I.

The District of Columbia Criminal Justice Act, D.C. Code Ann. §§ 11–2601—11–2609 (1981 and 1987 Supp.) (CJA or Act) provides for the reimbursement of private lawyers who are appointed to represent indigent criminal defendants.[2] Of all defendants who are unable to pay for counsel, 85% are represented by attorneys appointed under the CJA; another eight to ten percent are represented by the Public Defender Service (PDS), generally in more serious cases, and the rest are represented by third year law students (3–5%) and by *pro bono* private attorneys (under .5%). I.D.F. 19, 20.

Any member in good standing of the D.C. Bar, who has a local address and telephone number, may register with the CJA office of the PDS to receive appointments under the Act. Appointments are made by a Commissioner (or, on weekends, by a Superior Court judge) who compares a list of eligible defendants with a list of lawyers who have indicated their availability by telephoning the CJA office of the PDS between 7:45 a.m. and 8:15 a.m. that day. For the most part, names on the two lists are simply matched up in the order in which they appear until all the defendants have been provided counsel. The appointing official exercises some discretion, however, to assign a lawyer out of turn on the basis of the complexity of the case, the lawyer's known preferences, or the official's assessment of the lawyer's ability.

More than 1200 lawyers have registered for CJA appointments. In practice, however, most appointments go to a much smaller group of approximately 100 "CJA regulars," I.D.F. 18, who earn most or all of their income by representing indigent defendants. At least before the recent rate increase, the origins of which are at issue in this case, any lawyer who was interested in making a full time practice of CJA work could obtain a substantial caseload in a matter of weeks.[3] The CJA regulars accept CJA cases for a variety of reasons. Some of them have previous experience in public interest work and "consider representation of the poor [to be] the highest calling of the legal profession." I.D.F. 25. Some are motivated by an interest in criminal litigation. And some accept appointments under the CJA because there are no other legal jobs available to them. *Id.*

From 1970 until the boycott in 1983, fees for CJA cases were set at $30 per hour for time in court, and $20 per hour for other time, subject to a maximum of $1000 per case for felonies, $400 per case for misdemeanors, and $1000 per case for appeals.[4] The maximum compensation available to any individual for services provided under the Act was $42,000 per annum.[5] In order to get paid for CJA services, the attorney submits a voucher to the presiding judge showing the amount and nature of the time he or she spent on the case. The presiding judge has the authority to reduce the amount sought or, in particularly difficult or complex cases, to recommend to the Chief Judge compensation over the maximum per case limits. I.D.F. 27. Very few CJA regulars actually attained the annual maximum salary; one SCTLA member estimated that the average CJA lawyer made approximately $20,000 a year before the boycott. I.D.F. 29 & n. 102. In 1982, the District paid CJA lawyers a total of $4,579,572.

---

2. The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." In *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), the Supreme Court held that this provision required that counsel be provided whenever the defendant might suffer a loss of liberty.

3. I.D.F. 24; the record suggests that the CJA regulars received fewer appointments after the rate increase "whether they like it or not." Testimony of Perrotta at 677, JA 161.

4. At the time of the boycott, D.C.Code Ann. § 11–2604(a) capped compensation at the hourly scale established by 18 U.S.C. § 3006A(d)(2), the federal CJA statute.

5. Following the boycott, the limit was increased administratively to $50,000. *See* I.D.F. 29.

As early as 1975, the level of CJA fees became an issue of concern among some members of the bar. In that year, the Report on the Criminal Defense Services in the District of Columbia by the Joint Committee of the Judicial Conference of the D.C. Circuit and the D.C. Bar (Unified) at 77 (Austern–Rezneck Report), concluded that CJA attorneys were inadequately compensated. The Austern–Rezneck Report found that the prevailing rates drove talented lawyers out of CJA practice, and encouraged those who remained to do a less than adequate job on their cases. *Id.* at 78–79. The report therefore recommended that the CJA rates be increased to $40 an hour for time in or out of court, subject to a maximum $800 for a misdemeanor case and $1000 for a felony case. The report further expressed the belief that these rates "represent[ed] the absolute minimum necessary to attract and hold good criminal lawyers and assure their ability to render effective representation to their clients." *Id.* at 84.

Nonetheless, in 1982 the CJA rates remained unchanged from the level that had prevailed when the Austern–Rezneck report was released in 1975. In March 1982, the Report of the D.C. Court System Study Committee of the D.C. Bar, reprinted as Senate Print 98–34, 98th Cong., 1st Sess., Comm. on Govt'l Affairs (Horsky Report), recommended that all necessary steps be "taken by the Superior Court, the Mayor, and the D.C. Council to raise promptly the levels of compensation for attorneys appointed under the Criminal Justice Act to at least the levels proposed by the Austern–Rezneck Committee." *Id.* at 213. A bill increasing the hourly rate to $50 was then introduced in the D.C. Council, but it died in committee at the end of 1982 without a hearing. I.D.F. 36.

Meanwhile, in September 1982, petitioners Perrotta and Koskoff began a lobbying effort to increase the CJA compensation levels. Both petitioners, who were elected respectively President and Vice President of SCTLA in the fall of 1982, spent at least 90% of their time on CJA cases. I.D.F. 5–6. When they began their campaign, SCTLA was an informal association of CJA lawyers with no reliable membership list and no written by-laws. While the association kept a bank account, it did not enforce the rule that members pay $30 in annual dues. All CJA lawyers were allowed to participate in SCTLA meetings and to vote in SCTLA elections. I.D.F. 2–4.

Perrotta and Koskoff's early efforts included several conversations with Chief Judge Moultrie of the D.C. Superior Court, a meeting with Herbert Reid, Counsel to D.C. Mayor Marion Barry, and a strategy session with Wiley Branton, then Dean of Howard University Law School. Chief Judge Moultrie told Perrotta and Koskoff that he thought an increase in CJA compensation levels was deserved, but he declined to give any public support to pending legislation on the ground that, if such legislation were passed, his court might be called upon to determine its legality. Mr. Reid also expressed sympathy with their cause, but told them that the Mayor would not support the legislation without the urging of Chief Judge Moultrie. I.D.F. 37–39. Dean Branton advised that, since there was no organized and influential constituency to lobby for its passage, the prospects for an increase were poor unless the CJA lawyers did "something dramatic to attract attention in order to get any relief." I.D.F. 40.

In March 1983, D.C. Council Chairman Clarke introduced a new and less ambitious bill (No. 5–128), providing for a rate of $35 per hour for CJA work. This time the Judiciary Committee of the Council held a hearing at which numerous witnesses, including representatives of the SCTLA, various local bar groups, the PDS, the Executive Office of the D.C. Courts, and others testified in favor of the increase; no one testified against it except insofar as the Executive Branch of the D.C. Government raised concerns about funding it. Indeed, in June a member of the Council staff told Koskoff that there was no money available to fund the bill. This report was confirmed by the city's Budget Director, who claimed that the D.C. government supported the increase in principle. SCTLA's next effort, to interest the Congressional Appropria-

tions Subcommittee on the District of Columbia in federal funding for a CJA increase, was rejected for want of an initiative either from the legislative or from the judicial branch of the D.C. government. Finally, in August 1983, Koskoff and petitioner Reginald Addison, Secretary of SCTLA, "buttonholed" the Mayor in the corridor of the District Building. Like everyone else, the Mayor expressed his sympathy but indicated that there was no money to fund an increase. I.D.F. 41–45.

At this point, petitioners turned from lobbying for legislation to increase their wages to organizing a boycott of further CJA appointments at the rates then being paid.[6] They formed a "Strike Committee," which promptly agreed that a boycott of new CJA appointments was the only way to get a rate increase and adopted as their goal rate increases to $55 per hour for court time and $45 per hour for other time. Petitioner Slaight was designated Chairperson of the Strike Committee. Other CJA lawyers were assigned the tasks of informing all CJA lawyers of the boycott, contacting lawyers who might act as supporters or "strikebreakers," soliciting the support of courthouse personnel, and contacting the media. I.D.F. 47.

On August 11, 1983, SCTLA held a meeting attended by about 100 CJA attorneys. Koskoff and Addison reported on their unsuccessful lobbying efforts. By voice vote, the lawyers resolved not to accept new cases as of September 6 if their rates had not been raised by then. Immediately following this meeting, Perrotta and David Hirsch, a Strike Committee member, drafted a petition declaring that:

We, the undersigned private criminal lawyers practicing in the Superior Court of the District of Columbia, agree that unless we are granted a substantial increase in our hourly rate we will cease accepting new appointments under the Criminal Justice Act.

The petition, which was placed on the blackboard in the Lawyers' Lounge in Superior Court, was signed by a number of CJA attorneys. I.D.F. 48–49. On August 26, 1983, Perrotta sent a letter to 40 D.C. law firms that had previously indicated a willingness to do *pro bono* work, urging them not to accept CJA cases during the boycott. I.D.F. 55.

Beginning on September 6, all but a few of the CJA regulars stopped accepting new appointments. The SCTLA Strike Committee actively sought to publicize the boycott by handing out press kits, organizing picket lines, and staging rallies. Several CJA attorneys were interviewed on television and radio. This activity was "all designed to educate the general public about the plight of the CJA lawyers in the expectation that this would result in additional pressure on the District government to increase fees." I.D.F. 58.

The boycott had a severe impact on the criminal justice system, since there was no off-setting cessation of law enforcement activity. Thus, indigent defendants continued to be brought before the court in proceedings that required the services of a lawyer. After only a few days of the boycott, the PDS was swamped with cases. The response of the "uptown" bar to PDS's call for help was inadequate to meet the need for lawyers, reflecting, the Administrative Law Judge (ALJ) found, "their universal distaste for criminal law, their special aversion for compelled indigency representation, the near epidemic siege of self-doubt about their ability to handle cases in this field, and their underlying support for

---

6. Petitioners routinely used the word "strike" to describe their concerted refusal to accept new cases. Petitioners have not suggested, however, that they are "employees" within the meaning of § 20 of the Clayton Act, 29 U.S.C. § 52 (1982), which limits the granting of injunctions "in any case between an employer and employees, ... involving, or growing out of, a dispute concerning terms or conditions of employment," or that SCTLA is a "labor organization" within the meaning of § 6 of the same Act, 15 U.S.C. § 17 (1982), which provides that "[n]othing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help; ... nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." We therefore accept the FTC's considered characterization of SCTLA's action as a "boycott," as that term is used in antitrust parlance.

the demands of the CJA lawyers." I.D.F. 60.

On September 15, 1983, the PDS leadership sent a hand-delivered letter to the Mayor, Chief Judge Moultrie and Councilmember Rolark, who chaired the Judiciary Committee, apprising these officials of "the extremely serious situation that has now developed with respect to the legal representation of indigents in criminal and juvenile delinquency cases in the Superior Court of the District of Columbia." The letter noted that the resources of the PDS had been "taxed to a point where as of the beginning of next week it can no longer provide this quantity of assistance to the criminal justice system while continuing to render quality, effective legal representation." With respect to the assistance received from members of the private bar, the PDS noted that "[t]he daily need for representation of indigent defendants (sometimes over 80 such cases a day) has at this point seriously depleted the resources of the private bar who have volunteered to help the court. This leads the Service to conclude that future assistance from this source is problematic, at best." In conclusion, the letter urged the officials to "decide on an immediate course of action to address the situation" and suggested that "[a] public declaration of your unified support for [Bill No. 5–128] and of specific efforts to effect its enactment would, we believe, help greatly to resolve the present situation." I.D.F. 61. Chief Judge Moultrie confirmed to the Mayor the PDS's claim that the criminal justice system was approaching a crisis point. I.D.F. 62.

In response to the letter from the PDS, the Mayor sought and had a meeting with Koskoff, Perrotta, and Addison that evening. He agreed to express his support for Bill No. 5–128 and noted that the matter could be taken up as emergency legislation and enacted and signed on September 20. The Mayor also agreed to support introduction of a second bill, which would have to go through the normal legislative process,

to increase CJA fees further to $55 for court and $45 for other time. The next day, September 16, the Mayor wrote to Council-member Rolark to indicate his support for and willingness to fund the increased costs of Bill No. 5–128. Council Chairman Clarke and Councilmember Rolark agreed to expedite its passage on an emergency basis. Later that afternoon, the two legislators appeared at a meeting of CJA attorneys where they presented the $35 proposal as a "take it or leave it proposition." I.D.F. 63–65.

On September 19, 1983, SCTLA held a meeting to consider the City's proposal. A majority of the more than 100 CJA attorneys in attendance voted to accept the offer. After this decision was communicated to Council-member Rolark's office, the Judiciary Committee convened and reported out Bill No. 5–128. The next day, the D.C. Council passed the bill unanimously. I.D. F. 66–68. On September 21, 1983, the CJA attorneys began accepting new assignments. I.D.F. 69.

II.

In the wake of these events, the FTC filed a complaint alleging that the petitioners had engaged in "a conspiracy to fix prices and to conduct a boycott" in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "[u]nfair methods of competition," including restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1 (1982). *See FTC v. Cement Institute*, 333 U.S. 683, 694, 68 S.Ct. 793, 800, 92 L.Ed. 1010 (1948).[7] The case was referred to an ALJ who conducted an extensive hearing and issued an initial decision. Relying primarily on the Commission's then-recent decision in *Michigan State Medical Society*, 101 F.T.C. 191 (1983), the ALJ rejected the petitioners' contentions that their conduct was either political activity exempted from the antitrust laws by the First Amendment or that it was a form of petitioning for legisla-

7. The complaint is based upon petitioners' "coercive, concerted refusal to deal [*i.e.*, to accept new cases] for the purpose of increasing the CJA fees," and "not upon their price agreement alone nor upon their preboycott collective efforts to persuade the city government, solely by the force of argument, to raise the fees." FTC Decision, 107 F.T.C. at 573.

tive change, and as such immune from antitrust liability under *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The ALJ also concluded that the petitioners' interest as professionals in ensuring that the Sixth Amendment rights of their clients were not jeopardized by inadequate CJA rates did not exempt their boycott from the antitrust laws; he characterized the claim to the contrary as "simply a restatement of the argument that professional status alone merits a total antitrust exemption," which was rejected in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

Nonetheless, the ALJ dismissed the Commission's complaint on the "pragmatic basis" that "there was no harm done." This observation was itself based on the evidence showing that "city officials (and practically everyone else concerned with the criminal justice system)" believed that the prevailing rates were "inadequate to satisfy the 'political' (*i.e.*, constitutional) requirement of effective representation" and that "the CJA lawyers were unlikely to achieve higher fees if they continued to rely on communicative political petitioning alone."

On appeal, the Commission affirmed the ALJ's rejection of the petitioners' defenses but reversed his finding on liability. FTC Decision, 107 F.T.C. at 562–63. The Commission found that:

> [T]he city's purchase of CPA legal services for indigents is based on competition. The price offered by the city is based on competition, because the city must attract a sufficient number of individual lawyers to meet its needs at that price. The city competes with other purchasers of legal services to obtain an adequate supply of lawyers, and the city's offering price is an element of that competition. Indeed, an acknowledgement of this element of competition is implicit in the respondents' argument that an increase in the CJA fee was "necessary to attract, and retain, competent lawyers." If the offering price had not attracted a sufficient supply of qualified lawyers willing to accept CJA assignments for the city to

fulfill its constitutional obligation, then presumably the city would have increased its offering price or otherwise sought to make its offer more attractive. In fact, however, the city's offering price before the boycott apparently was sufficient to obtain the amount and quality of legal services that it needed.

*Id.* at 570–71. Petitioners, who are "competitors, individual entrepreneurs, selling their services to the District of Columbia," had engaged in a "coercive, concerted refusal to deal" in an attempt to restrain competition among themselves. *Id.* at 571, 573. Because their boycott had "the purpose and effect" of raising prices, the Commission concluded that it was illegal *per se*, that is, constituted a facially anticompetitive agreement. *Id.* at 572–75. Under the alternative Rule of Reason analysis, the Commission held that SCTLA had failed to establish any "countervailing competitive justifications" for the boycott; it rejected the suggestion that the boycott "would result in higher quality legal services" on the ground that it was irrelevant under the teaching of *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). *Id.* at 576–77.

The Commission also rejected the ALJ's finding that the boycott did not have an anticompetitive effect, noting that the rate increase required the city government to spend an additional $4 to $5 million a year for CJA legal services. As for the ALJ's finding that "the city [was] supportive of the boycotters' demands," the Commission found that it was not supported by the record—which "shows that the District government increased the fees ... only when it was coerced"—and that, even if proved, "the acquiescence or support of some members of the city government would not immunize the [petitioners'] boycott to increase prices from the antitrust laws." *Id.* at 577–78.

The Commission then considered the petitioners' claim that their activities were immune from the antitrust laws by virtue of the First Amendment. The Commission concluded that petitioners were not entitled

to the protections extended to participants in political boycotts, because:

> [T]he boycott of the CJA program was agreed upon among competitors and was designed to restrain competition for their direct economic benefit. The members of SCTLA explicitly sought to force concessions from the District government in its role as a buyer of services rather than its role as a policy maker.

*Id.* at 582, 583–89. Nor did their boycott fall within the antitrust immunity established in *Noerr* for concerted action to influence government decision-making. First, the FTC held, *Noerr* applies to efforts to solicit anticompetitive government action through lobbying or publicity, not by means of a coercive boycott. *Id.* at 589–95. Second, the anticompetitive effects of the petitioners' boycott resulted directly from the collective action of the boycotters and not, as in *Noerr,* from the independent action of the government: "The restraint was *on* the government, not *by* the government." *Id.* at 597 (emphasis in original). Finally, the FTC found no policy reason for granting an immunity from antitrust liability simply because the government rather than a private party was harmed by the boycott. The Commission therefore concluded that "[t]he mere fact that the government, as the only purchaser of CJA services, was the target does not protect their boycott from regulation." *Id.* at 599.

Having determined that the boycott was an unreasonable restraint of trade and that it was not protected by the First Amendment, the Commission entered an order requiring the petitioners to cease and desist from various boycott-related activities, compelling SCTLA to notify its members of the Commission's decision, and imposing upon the individual petitioners a duty to notify the Commission of changes in the nature of their legal practice for a five year period.

### III.

Petitioners raise a number of closely related objections to the FTC decision, but they do not seriously dispute that, if their conduct can properly be viewed through the ordinary lens of antitrust law, it constitutes an unreasonable restraint of trade. Instead, they argue strenuously that conventional antitrust analysis focuses attention on factors that are irrelevant in the peculiar market for their services—where demand is set by the requirements of the Sixth Amendment and price is set by the legislature—and overlooks the truly important First Amendment issues raised by the political conduct and context from which this case arises. Thus, they argue generally that they are immune from antitrust liability by reason of the *Noerr–Pennington* doctrine, which applies to those who would petition government to redress their grievances; specifically, they argue that the boycott was political activity protected under *Noerr,* notwithstanding its coercive element, because it was designed to influence the passage of legislation. In the same vein, even if *Noerr* does not apply to all conduct designed to influence the legislature, "then it is necessary, in order to avoid trenching excessively on First Amendment interests, to create an exception [from the antitrust laws] for nonviolent expressive conduct on issues of public concern."

As a further alternative, petitioners argue that "the Commission erred in failing to undertake an analysis of [their] market power." They argue that a *per se* rule is inappropriate as a matter both of antitrust and of constitutional analysis; and that, if the FTC is remitted to a Rule of Reason analysis, then "no antitrust violation can be found" because "the record clearly demonstrates the absence of market power."

We agree with petitioners in one important regard: the Commission must apply the antitrust laws to the facts of this case with a special solicitude for the First Amendment rights of these petitioners and others who, like them, engage in concerted action to advance both their political agenda and their own economic welfare at the expense of government. Unlike petitioners, however, we infer from this not that the government, in its role as a purchaser of goods and services, is left unprotected by the antitrust laws. Instead, we think it

both necessary and sufficient that those laws be applied prudently and with sensitivity. In this instance, such prudence and sensitivity require that the FTC prove that petitioners had economic power in a relevant market, even though such a showing is generally not required when competitors attempt to raise price by jointly refusing to deal with a would-be customer. Otherwise, there is simply too much risk that the antitrust laws will be used to penalize those who are able, through collective action, to wield political power in a way that serves their economic interest.

■ We consider first then whether, apart from any First Amendment protection to which it may be entitled, the SCTLA boycott was in violation of the antitrust laws. Like the Commission, we believe that petitioners' boycott constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act. Agreements among competing suppliers to restrict the available quantity of their product displace competition and thus tend to force up prices. This constriction of supply is the essence of "price-fixing," whether it be accomplished by agreeing upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered. *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 218–23, 60 S.Ct. 811, 841–44, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 394, 397–98, 47 S.Ct. 377, 378, 379–80, 71 L.Ed. 700 (1927); *American Column & Lumber Co. v. United States,* 257 U.S. 377, 410–12, 42 S.Ct. 114, 120–21, 66 L.Ed. 284 (1921); *San Juan Racing Ass'n, Inc. v. Asociacion de Jinetes de Puerto Rico, Inc.,* 590 F.2d 31 (1st Cir.1979). In this case, there is no room for doubt that there was a legally sufficient agreement among the defendants to restrict the supply of their services; the

individual petitioners do not deny that they agreed among themselves to withhold their services from the District of Columbia, a willing purchaser. This agreement was made at the SCTLA meeting of August 11, 1983, memorialized in the petition drafted by Perrotta, and implemented through the efforts of the Strike Committee. Nor is there any doubt that restraining competition in the market for their services was one of the purposes of the petitioners' conduct. Both the ALJ and the Commission found what the record clearly reflects, *viz.,* that the petitioners expected their boycott to disrupt the administration of the District's criminal justice system; to that end tried to dissuade non-SCTLA lawyers from taking CJA cases in their stead, which is to say, from competing with them; and intended the resulting pressure to force the District to accede to their demand for increased compensation.[8]

Petitioners suggest that this sort of traditional antitrust analysis should not be applied to what they characterize as a "totally non-traditional market." We are not at liberty, however, to suspend the application of the antitrust laws to particular markets that we might view as being "non-traditional." The antitrust laws prescribe competition in all markets, in all seasons, except as Congress may provide an exception.[9] Instead, it is our task to apply the antitrust laws in a discriminating manner that responds to the peculiar characteristics of the market in question, as it is the task of learned counsel for petitioners to identify any peculiarities of that market that may require a departure from the usual analysis.

Here, petitioners suggest that one cannot find "traditional price-fixing" because "the 'price-fixing' has been done by the D.C. City Council through legislation." In addi-

---

8. The finding that the boycott was intended to "coerce" the city into agreeing to a rate increase is not inconsistent with the petitioners' claim, discussed *infra* in sections V and VI, that their actions also served as a means of dramatizing their opposition to the prevailing rates.

9. *Cf. Federal Baseball Club of Baltimore, Inc. v. National League,* 259 U.S. 200, 42 S.Ct. 465, 66

L.Ed. 898 (1922) (national pastime not "commerce" within Sherman Act); *Flood v. Kuhn,* 407 U.S. 258, 282–84, 92 S.Ct. 2099, 2112–13, 32 L.Ed.2d 728 (1972) (acknowledging that professional baseball is "engaged in interstate commerce" but leaving to Congress any change in the "aberration" established by *Federal Baseball* ).

tion, we are told that the demand for CJA services is not the product of "traditional market forces" because it is generated by the Sixth Amendment requirement that the government make available counsel to criminal defendants who cannot otherwise afford a lawyer. In sum:

> [T]he total picture is a price-fixed market in which the suppliers are price takers, the consumers (i.e., the creators of demand) pay nothing, and the third-party payor (the D.C. Government) is a compulsory market participant, not a competitive insurance carrier.

Pet. Reply at 4.

But there is nothing in any of this that would justify a departure from conventional antitrust analysis. The Commission correctly determined that the CJA regulars act as "competitors" in the only sense that matters for antitrust analysis: They are individual business people supplying the same service to a customer, and as such may be capable, through a concerted restriction on output, of forcing that customer to pay a higher price for their service. That the D.C. government, like the buyers of many other services and commodities, prefers to offer a uniform price to all potential suppliers does not alter in any way the anti-competitive potential of the petitioners' boycott.[10] The antitrust laws do not protect only purchasers who negotiate each transaction individually, instead of posting a price at which they will trade with all who come forward. Nor should any significance be assigned to the origin of the demand for CJA services; here the District may be compelled by the Sixth Amendment to purchase legal services, there it may be compelled by the voters to purchase street paving services. The reason for the government's demand for a service is simply irrelevant to the issue of whether the suppliers of it have restrained trade by collectively refusing to satisfy it except upon their own terms.[11] We therefore conclude, as did the Commission, that the petitioners engaged in a "restraint of trade" within the meaning of Section 1.

■ Of course, the Sherman Act condemns only "unreasonable" restraints of trade. See *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Determining whether a restraint is unreasonable generally requires that it be examined in the context of the particular industry on which it operates, and that its anticompetitive potential be weighed against any procompetitive justifications that can be offered on its behalf. See *Chicago Board of Trade*, 246 U.S. at 238, 38 S.Ct. at 244. "Business certainty and litigation efficiency," however, require that agreements "that would always or almost always tend to restrict competition and decrease output," be condemned *per se*, that is, without an elaborate analysis of the industry or even careful consideration of the proffered justifications for the restraint. *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (*BMI*).

The Commission concluded that petitioners' concerted effort to raise the price of their service merited such *per se* condemnation. A price-fixing boycott is typically disposed of summarily under the Sherman Act, because, as the Supreme Court has consistently held, "the likelihood that horizontal price and output restrictions are

---

**10.** We do not read petitioners' characterization of the market for CJA services as *"price fixed,"* to suggest that the District of Columbia is a "monopsonist," *i.e.,* that it is the near exclusive purchaser of their services and is therefore capable of exerting market power over the price they are paid for their work. The record would not support such a claim, nor have petitioners argued that it is a defense (which would surely fail) that the victim of the boycott possessed monopsony power. *See Keifer–Stewart Co. v.*

*Joseph E. Seagram & Sons,* 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951) (no defense of price-fixing by manufacturers that wholesale purchasers had fixed resale prices).

**11.** Any individual lawyer is free to decline work at an unacceptable price, of course; the Sherman Act operates only against contracts, combinations, and conspiracies, and attempts thereat.

anticompetitive is generally sufficient to justify application of the *per se* rule without inquiry into the special characteristics of a particular industry." *National Collegiate Atheletic Ass'n v. Board of Regents,* 468 U.S. 85, 100 n. 21, 104 S.Ct. 2948, 2960, 82 L.Ed.2d 70 (1984) (*NCAA* ); *see Maricopa County,* 457 U.S. at 351, 102 S.Ct. at 2476–77; *BMI,* 441 U.S. at 19–20, 99 S.Ct. at 1562; *Professional Engineers,* 435 U.S. at 692, 98 S.Ct. at 1365.[12]

We recognize that the application of the *per se* rule to horizontal agreements, including boycotts, has become increasingly less rigid in recent years. This development was discussed in detail in *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 223–29 (D.C.Cir.1986). There we observed that several Supreme Court cases, most notably, *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and *United States v. Sealy Corp.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), insofar as they appeared to hold that *any* horizontal restraint was a *per se* violation of section 1, "must be regarded as effectively overruled" by more recent decisions. *Rothery,* 792 F.2d at 226. *BMI,* 441 U.S. at 1, 99 S.Ct. at 1551; *NCAA,* 468 U.S. at 85, 104 S.Ct. at 2948; and *Northern Wholesale Stationers, Inc. v. Pacific Stationers & Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), have decidedly shortened the reach of the *per se* rule. In the first two of these cases, the Court declined to apply the rule to horizontal arrangements affecting price or quantity, in each case reversing the court of appeals' "literal approach" to price-fixing on the ground that "the challenged practices may have redeeming competitive virtues." *BMI,* 441 U.S. at 9, 13, 99 S.Ct. at 1557, 1559; *NCAA,* 468 U.S. at 100–04, 104 S.Ct. at 2959–61. Indeed, in *Pacific Stationery,* the Court again reversed the lower court's *per se* analysis, this time of a "group boycott" by a wholesale purchasing coopera-

tive that expelled one of its members for failing to comply with a rule. The Court noted that "such cooperative arrangements would seem to be 'designed to increase economic efficiency and render markets more, rather than less, competitive' " because they permit "the participating retailers to achieve economies of scale . . ., and also ensure[ ] ready access to a stock of goods that might otherwise be unavailable on short notice." 472 U.S. at 295, 105 S.Ct. at 2620 (quoting *BMI,* 441 U.S. at 20, 99 S.Ct. at 1562). Moreover, "[w]holesale purchasing cooperatives must establish and enforce reasonable rules in order to function effectively." *Id.* Accordingly, "[t]he mere allegation of a concerted refusal to deal does not suffice" to trigger the *per se* rule, "because not all concerted refusals to deal are predominantly anticompetitive." *Id.* 472 U.S. at 298, 105 S.Ct. at 2621.

The Supreme Court's manifestly heightened concern with the effect of the *per se* rule on economic efficiency is not sufficient, however, to put this case beyond the grasp of that rule. As *Rothery* noted, the Court's recent cases have all examined the economic wisdom of the *per se* rule in the context of horizontal restraints that were "ancillary" to "an integration of the economic activities of the parties and appear[ed] capable of enhancing the group's efficiency." *Rothery,* 792 F.2d at 229. Here, by contrast, petitioners have advanced no claim that their boycott was ancillary and necessary to some larger, cooperative venture that permitted them to operate more efficiently. Instead, restraining competition and thus raising price was the *raison d'etre* of the boycott. Nothing in the two intervening Terms of the Supreme Court suggests a need to qualify our observation in *Rothery* that (as Judge Taft had seen from the outset), "a naked horizontal restraint, one that does not accompany a contract integration, can have no purpose other than restricting output and raising prices, and so is illegal per se." *Id.* at

---

**12.** The conclusion that a restraint is illegal *"per se"* may mean not only that the court will not consider any justification offered in support of it but also that it may be condemned without any proof that it had an adverse effect on com-

petition. The issue of whether the Commission must prove "market power" or price "effect" on the facts of this case is discussed *infra* in section VI.

229 (citing *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898), *aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899)).

Perhaps economic efficiency is not the only garb in which an otherwise naked restraint can be made respectable in a civilized society, however. Petitioners seek to wrap themselves in the mantle of the Sixth Amendment, and when the constitutional rights of their clients are invoked, we are indisposed to disregard their argument merely because it is novel or would require us to acknowledge a new exception to the *per se* rule. Efficiency may indeed be the only rationale intrinsic to the logic of the antitrust laws for exempting a horizontal restraint from *per se* condemnation. If the integrity of the Sixth Amendment right to counsel requires it, though, we should not shrink from acknowledging a constitutional limitation on the reach of the *per se* rule. Nor does the *per se* rule bar us from evaluating a novel and potentially significant defense. For, as Professor Areeda has noted, "[c]ourts do not ordinarily mean to preclude themselves from future thoughts about new matters which have not previously been considered." VII P. AREEDA, ANTITRUST LAW ¶ 1510a at 416 (1986). Moreover, considering petitioner's justification does not threaten to enmesh us in an "elaborate industry analysis." *Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. In *Professional Engineers,* for example, the Supreme Court indulged in a limited evaluation of the non-efficiency justification proffered by the defendant. Although the Court ultimately rejected the defendant's safety rationale for displacing *per se* condemnation with Rule of Reason analysis, *see id.* at 693–95, 98 S.Ct. at 1366–67, we can hardly give shorter shrift to an argument based upon the constitutional right to counsel.

Petitioners' argument proceeds as follows: SCTLA's boycott was really a protest responding to "a 'market failure' situation brought on by the D.C. Government's inflexible pricing scheme." Such protests against government pricing policies "are in fact carried out by picturesque 'small people' in the Jeffersonian tradition—independent farmers [spilling milk to protest government price support levels and] gasoline station operators [closing to protest price regulations limiting their markup]." Such actions aim to benefit consumer welfare by offsetting a "market failure due to government action." According to petitioners, "[g]overnments frequently distort markets by setting prices, rationing, or regulating prices—because competitive pricing would produce 'politically unacceptable' results." In this case, we are told, "competitive pricing" was politically unacceptable to the D.C. Government because of the underlying antipathy of the taxpaying (and voting) public to the rights of indigent defendants. This antipathy induced the District to set the CJA rates at a level that was too low to provide the effective representation mandated by the Constitution. Since persuasion was unlikely to alter this politically popular but constitutionally dubious result, coercion by the only means available, a collective boycott, was necessary to raise the prevailing rates to the "competitive" price.

Although the matter is not entirely free from doubt, we interpret the "competitive price" in this argument to mean either the price that defendants would willingly pay for counsel if only they were not indigent, or at least what is surely a lesser amount, the price necessary to call forth an adequate supply of legal representation of a quality sufficient to secure the constitutional right to effective assistance of counsel.

Before we evaluate the validity of this defense against the *per se* rule, we pause briefly to discuss a fundamental premise upon which the petitioners rely, *viz.,* that increasing the hourly rate for CJA legal services would improve the quality of representation to indigent defendants. The FTC has not seriously challenged this assumption, but neither has the SCTLA attended much to establishing the relationship it assumes between the price and the quality of CJA lawyering. It is easy enough to imagine that an increase in the ceiling on compensation for each case would lead to better representation since attorneys would be able to devote more

hours to each case without fear of being denied payment for their efforts; this would be true if the per case ceiling was a constraint in a significant number of cases. But the ceiling on compensation was, at best, a minor reason for the boycott. As the SCTLA petition noted, the major purpose of the boycott was obtaining "a substantial increase in [the] hourly rate."

It is not immediately clear whether increasing the hourly rate paid to CJA regulars would increase the quality of the services they provide.[13] The record is not entirely barren on this point. Some witnesses suggested that higher hourly rates would enable attorneys to take on fewer cases and thus, perhaps, to provide better service because their attention would be less fragmented.[14] On the other hand, one of the leaders of the SCTLA boycott testified that the increased rates made it possible for him to pay for support services that, in turn, enabled him to take on more cases.[15] But it is surely fond for us to speculate whether increased fees produce more or less effort on behalf of clients; economists have been unable to determine a priori the effect of increased wages on the trade-off between leisure and work,[16] and we can hardly purport to do so on the basis of a record developed with other questions principally in mind.

It is easier to see why increasing CJA rates might improve the quality of legal services, however, when one considers the effect of the rate increase on the size and quality of the pool of attorneys willing to take on CJA work. The leaders of the SCTLA boycott quite reasonably expected that a significant rate increase would induce more attorneys to take on CJA cases. Indeed, some CJA regulars opposed the boycott for just that reason.[17] This expectation and fear was fully realized. There has been a substantial increase in the number of attorneys willing to take CJA cases, and a corresponding decrease—it is not clear whether voluntary or involuntary—in the caseloads of the old regulars.[18] It is inferable that the lawyers newly attracted to CJA work by the increased hourly rates had been able to earn more in other types of practice than they could in CJA work under the pre-boycott rate schedule; insofar as lawyers respond to pecuniary incentives, as opposed to the other compensations they may derive from their work, it is reasonable to suppose that the lawyers attracted to CJA work at the higher rates were, in market terms, better lawyers. (Of course, it is possible in the representation of indigent criminal defendants that humanitarian instincts or ideological zeal contribute more to the quality of representation than the talents of lawyers that are brought out only by higher wages; still, even altruists must often feed a family and so respond, at the margin, to increased incentives.) And as the ALJ noted, while "a dramatic transformation in the quality of indigency practice is unlikely," the increased rates might provide an incentive

---

13. *Cf. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 769, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976) (rejecting a claim that a ban on advertising by pharmacists was necessary to ensure quality and noting that "[t]here is no claim that the advertising ban in any way prevents the cutting of corners by the pharmacist who is so inclined. That pharmacist is likely to cut corners in any event. The only effect the advertising ban has on him is to insulate him from price competition and to open the way for him to make a substantial, and perhaps even excessive, profit in addition to providing an inferior service.")

14. *See, e.g.,* Testimony of Cheryl D. Stein at 61, JA 446; Testimony of Slaight at 81, JA 473; *cf.* Testimony of Perrotta at 729, JA 195 (increased respect from judges).

15. *See* Testimony of Addison at 886–88, JA 254–56.

16. *See, e.g.,* P. SAMUELSON, ECONOMICS at 579–80 (10th ed. 1976); A. ALCHIAN & W. ALLEN, UNIVERSITY ECONOMICS at 462–64 (1964).

17. *See* Testimony of Perrotta at 123, JA 498 ("As a matter of fact, one of the interesting things about the work stoppage ... was that there were some people, fringe people, in terms of competence and skill who were against it for precisely that reason, that they felt that there would be more competition and that they would end up getting fewer cases.")

18. Testimony of Perrotta at 677, JA 161 (100–120 lawyers call in for cases daily whereas 40–60 did so before rates were increased; lawyers get fewer cases "whether they like it or not").

for the more dedicated CJA lawyers to remain in the practice for a longer period of time. I.D.F. 72. These factors suggest that the quality of CJA services is likely to be improved in some indeterminate degree by a rate increase and we will assume, for the present discussion, that this is so.

We must next consider whether such an increase in quality can justify petitioners' boycott. The Commission concluded that it could not, relying primarily upon *Professional Engineers*. In that case, the Court considered a provision in the Society's "canon of ethics" that effectively prohibited competitive bidding by its members. In its defense, the Society suggested that under the Rule of Reason the canon was justified because "competitive pressure to offer engineering services at the lowest possible price would adversely affect the quality of engineering," and thus endanger public safety. 435 U.S. at 685, 98 S.Ct. at 4362. The Court accepted the posited relationship between price and quality, and the risk that could result, but noted that, in the absence of the canon, a purchaser could always choose to forego the price advantages of competitive bidding in order to improve the quality of the product, and an individual seller of professional services could independently refrain from bidding for work. *Id.* at 694, 98 S.Ct. at 1366. The Court therefore found the Society's ethical canon to be unreasonable. The ban on competitive bidding imposed the seller's "views of the costs and benefits of competition on the entire marketplace," and conflicted with the legislative judgment embodied in the Sherman Act that competition "will produce not only lower prices, but also better goods and services." *Id.* at 695, 98 S.Ct. at 1367.

The argument advanced by the defendants in *Professional Engineers* constituted, in the words of the Supreme Court, "a frontal assault on the basic policy of the Sherman Act." *Id.* at 695, 98 S.Ct. at 1367. For the engineers were far from unique in being able to posit at least a plausible relationship between the quality of their product and the elimination of competition. As the Court noted:

Exceptions to the Sherman Act for potentially dangerous goods and services would be tantamount to a repeal of the statute. In our complex economy, the number of items that may cause serious harm is almost endless—automobiles, drugs, foods, aircraft components, heavy equipment, and countless others, cause serious harm to individuals or to the public at large if defectively made. The judiciary cannot indirectly protect the public against this harm by conferring monopoly privileges on the manufacturers.

*Id.* at 695–96, 98 S.Ct. at 1367. We need hardly add defective legal representation of a criminal defendant to the court's list of potentially harmful goods and services.

To be sure, SCTLA makes a more limited claim regarding the quality of their services than that advanced by the Society of Professional Engineers: Petitioners here claim only that the usual assumption that competition will produce "better goods and services" does not apply where the market price is subject to the distorting influence of the "political process," and is particularly inapplicable where the polity is a purchasing agent for the least influential segment of society, indigents accused of crimes. The difficulty with this theory is immediately apparent, however, when one considers how a court is to evaluate a claim that the political process had failed to arrive at the "competitive price." No doubt most business people who sell to the government are of the opinion that they could better serve the public if only the price of their goods or services were increased. Many of them may also be able to show that price is kept down by the force of the "political pressure" exerted by some group with opposing interests—such as taxpayers. Doctors who provide medical services to beneficiaries of the Medicaid program, for example, may be able to show that the rates of reimbursement set by the federal government fall below the price they charge for high quality medical services in the competitive market, and that they systematically skimp in their treatment of Medicaid patients as a result. Moreover, they may be able to show that the rates for

reimbursement of participating doctors are held down by the unwillingness of taxpayers to respond sympathetically to the medical needs of the indigent. Regardless of how conclusive their evidence, however, the judicial branch is not licensed to pass judgment upon the adequacy of the expenditures authorized by the political branches of government except in those rare cases (of which more below) where there is a constitutionally mandated standard that sets the minimum level of service that the state must provide.

■ Petitioners may choose to call it a "market failure" when the political process responds less to the demands of the weak—although it seems to be more of a tautology than a description—but call it what one will, courts are in no position to determine whether such a "failure" has occurred, much less to remedy it by handing out exemptions from the Sherman Act. Nor are we prepared to take the admittedly more manageable but even less responsible course of simply permitting all coercive boycotts aimed at a government. Congress surely did not mean to leave governments so vulnerable to extortion by the suppliers of the goods and services they need. There is, then, no general exception to *Professional Engineers* for restraints of trade aimed at prices set through the political process.

Without emphasizing the point, petitioners have at times suggested that their boycott was necessary to vindicate the constitutional rights of their clients, *i.e.*, that the pre-boycott rates they were paid did not elicit the constitutionally required minimum level of legal assistance for the accused.[19] We recognize that the legislature may be required to alter its level of spending in order to accommodate rights grounded in the Constitution. If, for example, the political process results in conditions of confinement that do not satisfy the standards of the Eighth Amendment, the courts may order remedial steps that in effect require the government to devote additional resources to the prison system. In such cases, the constitutional provision establishes a standard by which the court can evaluate the choices of the political branches. Even there, we note, a court would not ordinarily have reason to order a specific level of expenditure, since it can instead specify the condition to be achieved and leave it to the government to fulfill that condition in the most economical way it can find.

Since they have not argued the point, however, we need not decide the novel question whether a contract, combination, or conspiracy that would otherwise be an unlawful restraint of trade under the Sherman Act may be justified on the ground that it was necessary to vindicate the constitutional rights of others.[20] Counsel for the petitioners acknowledged at oral argument before the Commission that the pre-boycott level of services was adequate to secure the Sixth Amendment rights of their clients. *See* 107 F.T.C. at 587.[21]

19. Petitioners put into the record a letter from the Director of the Administrative Office of the United States Courts to the Speaker of the House (April 7, 1983) urging, on behalf of the Judicial Conference of the United States, passage of legislation increasing the per case maximum and authorizing the Conference to adjust the hourly rate for work done under the federal version of the CJA, and observing "increasing concern at all levels of the Federal Judiciary that further delay ... may significantly erode the quality of legal services which the Sixth Amendment to the Constitution mandates." Resp.Exh. 40, JA 672.

20. The Commission takes the position that the boycott would not be justified even if "denial of Sixth Amendment rights was rampant" since "the remedy for such an evil would still lie with the three branches of government, not with a suppliers' cartel." FTC Brief at 35–36 n. 35 (citing *Fashion Originator's Guild, Inc. v. FTC,* 312 U.S. 457, 467–68, 61 S.Ct. 703, 707–08, 85 L.Ed. 949 (1941)).

21. The Commission specifically found that the quality of representation before the boycott was "adequate under Sixth Amendment standards." *See* 107 F.T.C. at 587. In support of this finding, it cited to the decision of the ALJ at I.D.F. 25, but the ALJ there concluded only that "[o]n the basis of this record, no definitive finding can be made about the performance of CJA lawyers in handling their caseloads except to observe that collectively they move a large volume of cases through the District's criminal justice system"; that they are of uneven quality and have diverse motivations for doing CJA

It may be true, as the amicus American Civil Liberties Fund of the National Capital Area suggests, that SCTLA was reluctant to introduce evidence demonstrating that its members committed legal malpractice on a regular basis. Surely less would have been required, though. For example, petitioners could have argued that the per case ceiling was inherently inadequate to allow for effective assistance in some cases without exposing themselves to any embarrassment. They could likewise have argued that the quality of low-paid representation falls below the constitutional minimum without inviting criticism by referring to statistics on cases pleaded instead of tried, in comparison with other jurisdictions, and such other indices as accomplished counsel could devise under the spur of incentive. Instead, they have simply not pursued the argument, and their occasional references to the constitutional underpinnings of their boycott are but so much parsley to garnish the arguments they have made. Thus, we decide this case as it comes to us, upon a record that does not support, and by petitioners who do not seek, a finding that the pre-boycott rates resulted in systematic violations of the Sixth Amendment.

To summarize thus far, we hold that the SCTLA boycott was an unlawful restraint of trade. Since no "pro-competitive" justification, that is, no justification that is consistent with the purposes of the antitrust laws, has been offered in its defense, and no constitutional barrier has been interposed, the boycott could properly be condemned as a *per se* violation of Section 1 of the Sherman Act, unless it also

comes within the protection of the First Amendment.

### IV.

We next consider whether the boycott may be immune from the Sherman Act as an exercise of the petitioners' constitutional rights to speak and to petition the government for the redress of their grievances. Relying upon the Supreme Court's decisions in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), the petitioners argue that non-violent conduct, including a suppliers' boycott, designed solely to influence the passage of legislation, is protected from the proscriptions of the antitrust laws. In the alternative, petitioners argue that the Commission, at a minimum, must "create an exception for non-violent conduct designed to dramatize public issues (*i.e.*, issues of interest to a broader group than the boycotters themselves)."

The plaintiffs in *Noerr*, a number of truck operators and their trade association, alleged that a group of railroads had conspired to monopolize the long-distance freight business by conducting a publicity campaign aimed at encouraging the adoption of laws and law enforcement practices destructive of the trucking business. 365 U.S. at 129, 81 S.Ct. at 525. The Court thought it clear, for two reasons, that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the

---

work; and that "the CJA corps still has its fair share of courthouse 'hangers-on' who take as many cases as possible (usually misdemeanors) in the expectation that without investigation, preparation, or concern for the particular needs of their clients, their cases will plead out, and hassles with Bar Council over charges of ineffective representation will be avoided as a living is scratched out collecting CJA fees."

Nor can the low rate of reversals of criminal convictions on Sixth Amendment grounds, upon which the FTC drew, provide substantial support for the Commission's finding. A conviction may be affirmed despite the substandard performance of counsel unless the court determines that this performance "so undermined

the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Advising a client to accept the offer of a bargained plea will occasion even less rigorous judicial second-guessing when the defendant later seeks a writ of habeas corpus, claiming ineffective assistance of counsel. It does not follow, apodictically, therefore, that "[i]f the city's fees for CJA lawyers had been inadequate to elicit competent counsel for indigents, a history of reversals of criminal convictions on Sixth Amendment grounds would have signalled that inadequacy." 107 F.T.C. at 587.

executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Id.* at 136, 81 S.Ct. at 529. First, the Court stressed the desirability, in a representative democracy, of allowing interested parties to make their views known to the government:

[To] hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of the Act.

*Id.* at 137, 81 S.Ct. at 529. Second, the Court noted that:

The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Id.* at 138, 81 S.Ct. at 530. In response to the charge that the railroads had intended their publicity campaign to hurt the truckers directly by damaging the goodwill of their customers and of the public, the Court held that any such "direct injury" was merely "an incidental effect of the railroads' campaign to influence governmental action." *Id.* at 143, 81 S.Ct. at 532. The prohibitions of the Sherman Act would be applicable only if a publicity campaign ostensibly directed toward influencing governmental action were a "mere sham." *Id.* at 144, 81 S.Ct. at 533.[22]

Petitioners would assimilate their boycott to the protected lobbying activity considered in *Noerr*, on the ground that the *Noerr* Court distinguished broadly between "business activity" and "political activity," and held that the Sherman Act was intended to regulate the former but not the latter. SCTLA argues that "the teaching of *Noerr* is that the right to petition is of sufficient importance that genuine efforts to influence the legislature are not subject to the antitrust laws, even if in the process they result in ancillary anticompetitive effects in the marketplace that would otherwise constitute an antitrust violation." Since the SCTLA boycott was clearly an effort to influence the legislative process, SCTLA asserts that it qualifies as "political activity" exempt from the Sherman Act.

In evaluating petitioners' argument, we note first that nothing in *Noerr* itself suggests that, by distinguishing between "business" and "political" activity, the Court intended to remove from the reach of the Sherman Act all conduct that is aimed at obtaining favorable legislation. Indeed, the *Noerr* court specifically distinguished between lobbying and boycotts. Collective efforts to persuade the legislature or the executive to take particular action, the Court said:

bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements.

365 U.S. at 136, 81 S.Ct. at 529 (citations omitted).

Were we guided solely by *Noerr*, therefore, we would be disinclined to accept the expansive immunity claim advanced by petitioners.[23] Happily, any lingering doubt

---

**22.** The result in *Noerr* was extended in *United Mine Workers v. Pennington*, 381 U.S. 657, 669–71, 85 S.Ct. 1585, 1593–94, 14 L.Ed.2d 626 (1965), to anticompetitively motivated efforts to influence administrative action.

**23.** Indeed, lower courts have declined to interpret *Noerr* in the fashion suggested by petitioners. Thus, *Noerr* immunity has been denied to lobbying efforts that use undesirable methods without regard to whether the participants' de-

sire to influence the government was "genuine." *See Sacramento Coca–Cola Bottling Co. v. Chauffeurs, Teamsters & Helpers Local No. 150,* 440 F.2d 1096, 1099 (9th Cir.1971) (*Noerr* and *Pennington* do not apply to "threats, intimidation and other coercive measures"); *Westborough Mall v. City of Cape Girardeau,* 693 F.2d 733, 746 (8th Cir.1982) (*Noerr* does not apply to lobbying efforts accompanied by illegal or fraudulent actions); *see also Woods Exploration & Producing Co. v. Aluminum Co. of America,*

about the overbreadth of petitioners' interpretation was resolved by the Supreme Court's recent decision in *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* —— U.S. ——, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). *Allied Tube* addressed the antitrust immunity available to competitors who agree to exclude a rival from the market by using the standard-setting process of a private organization, there the National Fire Protection Association.[24] In the course of evaluating the respondent's claim to *Noerr* immunity, however, the Court set forth a general approach for determining whether collective conduct falls within the reach of *Noerr.*

"The scope of [*Noerr*'s] protection," the Court wrote, "depends ... on the source, context, and nature of the anticompetitive restraint at issue." *Id.* 108 S.Ct. at 1936. First, concerning the source of the restraint, a court must consider whether it is the result of valid governmental or private action. If the former, "those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint." *Id.* If the latter, the

restraint is immune from antitrust liability only if it is " 'incidental' to a valid effort to influence governmental action." *Id.* at 1940 (quoting *Noerr,* 365 U.S. at 143, 81 S.Ct. at 532). The Court repeatedly stressed that not all efforts to secure government action merit protection under *Noerr;* instead, "[t]he validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity." *Id.* 108 S.Ct. at 1936; *see also id.* at 1939. These two factors—context and nature—determine whether the conduct at issue is more appropriately characterized as "political activity with a commercial impact," immune from antitrust liability under *Noerr,* or as "commercial activity with a political impact," which must be evaluated "under the standards of conduct set forth in the antitrust laws." *Id.* at 1941, 1942.

Here, as in *Allied Tube,* the restraint as issue, *i.e.,* the boycott, plainly resulted from private, rather than governmental, action. Thus, the conduct is immune under *Noerr* only if it was a valid effort to influence governmental action,[25] which turns on

438 F.2d 1286, 1296–98 (5th Cir.1971) (*Noerr* does not protect a conspiracy to supply false information to a government agency).

A small number of cases have considered whether *Noerr* protects boycotts by competitors aimed at influencing governmental action. The majority of these decisions have concluded that it does not. *See United States v. North Dakota Hospital Ass'n,* 640 F.Supp. 1028, 1040–43 (D.N. D.1986) (agreement by competing hospitals to deny the Indian Health Service a contractual price discount); *COMPACT v. Metropolitan Government,* 594 F.Supp. 1567, 1572–73 (M.D. Tenn.1984) (agreement among black architectural firms to negotiate jointly on public projects); *Osborn v. Pennsylvania–Delaware Service Station Dealers Ass'n,* 499 F.Supp. 553, 555, 557–58 (D.Del.1980) (agreement among gasoline dealers to cease all sales to customers until maximum retail price of gasoline is increased);. *In re Michigan State Medical Soc.,* 101 F.T.C. 191, 296–301 (1983) (agreement among competing doctors to increase state Medicaid reimbursement rates by threatening collective departicipation). *But see Crown Central Petroleum Corp. v. Waldman,* 486 F.Supp. 759 (M.D.Pa. 1980) (boycott by gasoline retailers aimed at increasing maximum retail prices was exempt from the antitrust laws under *Noerr* ). *See also Missouri v. National Organization for Women, Inc.,* 620 F.2d 1301 (8th Cir.1980) (Sherman Act is not applicable to a convention boycott by the

National Organization for Women against all states that had not ratified the Equal Rights Amendment).

**24.** Allied Tube, the nation's largest producer of steel conduit for electrical wires, conspired with other interested parties to exclude the plastic conduit manufactured by its competitor, Indian Head, from the electrical conduit market. To this end, Allied Tube "packed" the 1980 annual meeting of the National Fire Protection Association with 155 new members whose only function was to vote against a proposal to include plastic conduit as an approved type of electrical conduit in the Association's 1981 National Electric Code. The plan was successful and Indian Head's product was excluded entirely in a substantial number of jurisdictions that adopted the National Electric Code directly into law. Recovery was based on the sales that Indian Head lost where its product could lawfully be used but was not used because of the stigma of not obtaining Code approval.

**25.** *Allied Tube* suggests that for *Noerr* to apply, the restraint must also be "incidental" to the effort to influence governmental action. This requirement is aimed at situations, as in both *Noerr* and *Allied Tube,* where efforts to influence the government cause "direct" harm to competitors in the marketplace in addition to any harm resulting from governmental action.

whether it was primarily "commercial" or "political" in nature.

Unlike *Allied Tube*, the relevant conduct here did take place in a political context— the legislative arena—which weighs in favor of petitioners' claim to *Noerr* immunity for their boycott. *See id.* at 1936–37, 1939; *see also id.* at 1941 n. 11. The nature of the activity, however, counsels strongly against *Noerr* immunity. Concerted refusals to deal by competitors cannot be regarded as "activity that has traditionally been regulated with extreme caution," *id.* at 1940 (citing *Noerr*, 365 U.S. at 141, 81 S.Ct. at 531), or as "activity that 'bear[s] little if any resemblance to the combinations normally held violative of the Sherman Act.'" *Id.* (quoting *Noerr*, 365 U.S. at 136, 81 S.Ct. at 529). Moreover, SCTLA did not "confine itself to efforts to persuade"; instead, it "organized and orchestrated" a concerted effort to restrict the supply of services in the marketplace. *See id.*

Although the boycott thus seems to have been commercial in nature, petitioners, citing to the Supreme Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982), nonetheless maintain that it was indeed "political activity" (variously referred to as "political petitioning," "efforts to mobilize political pressure," and even as "political theatre").[26]

See supra at 33, 36 n. 24. In such cases, the court must ensure that the defendants' efforts to influence legislative action are not a "mere sham" to cover what is actually an attempt to interfere directly with a competitor's business relationships. In this case, however, the boycott was aimed solely at the government as a purchaser of goods and services, and there is no allegation that the boycott caused the District any marketplace harm that is distinguishable from the harm caused by petitioners' efforts to induce the District government to raise their compensation. It therefore makes little sense to ask whether the boycott is "incidental" to the defendant's efforts to influence the government. Instead, the relevant question is simply whether it is a "valid" effort to influence government action.

**26.** The possibility that boycotts organized for "political" purposes may be expressive conduct

In *Claiborne Hardware*, the Court reversed a state tort judgment against the National Association for the Advancement of Colored People and a large number of individuals who had participated in a boycott of white merchants in Claiborne County, Mississippi, from 1966 to 1972. The boycott was aimed at achieving a score of specific "Demands for Racial Justice," including such basic claims on the state as the desegregation of public schools and facilities, selection of blacks for jury duty, and the hiring of black policemen, as well as an afterthought demand for the employment of blacks as clerks and cashiers in all local stores. *Id.* at 899–900, 102 S.Ct. at 3418. The Court concluded that the meetings, speeches, and nonviolent picketing used to support the boycott were "political expression" that is "ordinarily entitled to protection under the First and Fourteenth Amendments." *Id.* at 907–08, 102 S.Ct. at 3422. The Court then considered whether the "strong governmental interest in certain forms of economic regulation," including regulation of business entities who associate "to suppress competition," justified an intrusion on ordinarily protected activity. *Id.* at 911–12, 102 S.Ct. at 3425. Distinguishing between political and economic activity, and acknowledging the state's broad power to regulate the latter, the Court discussed *Noerr* at some length, noting both the similarities and differences between the facts before it and the facts in *Noerr*:

protected from regulation under the Sherman Act has generated intense interest among commentators. The relevant literature includes Hurwitz, *Abuse of Governmental Processes, the First Amendment and the Boundaries of Noerr,* 74 Geo. L.J. 65, 111–16 (1985); Kennedy, *Political Boycotts, the Sherman Act, and the First Amendment,* 55 S.Cal.L.Rev. 983 (1982); Note, *A Market Power Test for Non–Commercial Boycotts,* 93 Yale L.J. 523 (1984); Note, *NOW or Never: Is There Antitrust Liability for Noncommercial Boycotts?,* 80 Colum.L.Rev. 1317 (1980); Comment, *Protest Boycotts Under the Sherman Act,* 128 U.Pa.L.Rev. 1131 (1980); Note, *Political Boycott Activity and the First Amendment,* 91 Harv.L.Rev. 659 (1978); *see also* Bird, *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal,* 1970 Duke L.J. 247; Coons, *Non–Commercial Purpose as a Sherman Act Defense,* 56 Nw. U.L.Rev. 705 (1962).

It is not disputed that a major purpose of the boycott in this case was to influence governmental action. Like the railroads in *Noerr*, the petitioners clearly foresaw —and directly intended—that the merchants would sustain economic injury as a result of their campaign. Unlike the railroads in that case, however, the purpose of the petitioners' campaign was not to destroy legitimate competition. Petitioners sought to vindicate rights of equality and of freedom that lie at the heart of the Fourteenth Amendment itself. The right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself.

*Id.* at 914, 102 S.Ct. at 3426. Because there was " 'no suggestion that the [participants in the Claiborne boycott] were in competition with the white businesses or that the boycott arose from parochial economic interests,' " the Court held that the nonviolent elements of the boycott were entitled to the protection of the First Amendment. *Id.* at 915, 102 S.Ct. at 3426 (quoting and approving the words of Judge Ainsworth in *Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir.1979), an earlier phase of the litigation over the Claiborne boycott).

Petitioners read *Claiborne Hardware* as holding that boycotts aimed at influencing the political process are "First Amendment activity" that is not covered by the antitrust laws.[27] As clearly reflected in the intended quotation above, however, the determination in *Claiborne Hardware* that the boycott was "political activity" was not based simply on the broad ground that the blacks sought by their boycott "to influence government action." Instead, as the Supreme Court reemphasized in *Allied Tube, Claiborne Hardware* rests on the findings that

> the boycott was not motivated by any desire to lessen competition or to reap economic benefits but by the aim of vindicating rights of equality and freedom lying at the heart of the Constitution, and the boycotters were consumers who did not stand to profit financially from a lessening of competition in the boycotted market.

108 S.Ct. at 1941; *see also Roberts v. United States Jaycees*, 468 U.S. 609, 636, 104 S.Ct. 3244, 3259, 82 L.Ed.2d 462 (1984) (O'Connor, J., concurring).[28]

*Claiborne Hardware* thus makes the motivation for the SCTLA boycott a crucial factor in determining whether it constituted protected "political" activity. Before

27. In considering the impact of *Claiborne Hardware* on the petitioners' *Noerr* defense, we note, as a preliminary matter, that while *Claiborne Hardware* involved the state law tort of malicious interference with a business, nothing in the Court's opinion suggests that it would apply any different analysis to conduct that allegedly violates the federal antitrust laws. To the contrary, *Claiborne Hardware's* discussion of *Noerr* suggests that the Court believed its analysis would be equally applicable in Sherman Act context.

28. It is clear that not even politically motivated boycotts enjoy First Amendment protection against sanctions under all circumstances. In *International Longshoremen's Ass'n v. Allied International, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed. 2d 21 (1982) (*ILA*), a case decided less than three months before *Claiborne Hardware*, the Court rejected, in a brief paragraph, the claim that a politically motivated secondary boycott by a labor union was entitled to First Amendment protection. Longshoremen had refused to handle cargoes arriving from or destined for the Soviet Union in order to protest the invasion of Afghanistan. The Court stated it has

> consistently rejected the claim that secondary picketing by labor unions in violation of § 8(B)(4) [of the National Labor Relations Act] is protected activity under the First Amendment. (Citations omitted.) It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment.

456 U.S. at 226, 102 S.Ct. at 1664–65. The Court also noted that "[t]here are many ways in which a union and its individual members may express their opposition to Russian foreign policy without infringing upon the rights of others." *Id.* at 227, 102 S.Ct. at 1665.

In *Claiborne Hardware* the Court referred to *ILA* for the proposition that economic regulation in furtherance of an important or substantial government interest is not unconstitutional merely because it has an incidental effect on First Amendment freedoms. *See* 458 U.S. at 912, 102 S.Ct. at 3425.

the Commission, petitioners argued that their boycott was undertaken in order "to obtain more effective counsel for indigent defendants in furtherance of their Sixth Amendment rights." 107 F.T.C. at 584. The Commission disagreed; it found that "the boycott of the CJA program was undertaken to improve the economic well-being of the participants as competitors in the market for CJA services." *Id.* at 582. While petitioners' briefs in this court do not specifically challenge this finding, their argument implicitly contradicts it, which is sufficient, in this First Amendment context, to initiate our review of the finding.

Distinguishing between political and economic motives is a daunting task, even for a reviewing court which is asking only whether the characterization affixed by the finder of fact is supportable in the record. The inherent difficulty of determining another's subjective motivation is compounded where the actor's motives may understandably be mixed. Nonetheless, the objective circumstances surrounding the conduct give important clues as to the primary motive behind it, which in this case was clearly enough more economic than not.

The SCTLA boycott was organized by competitors for the immediate purpose of increasing the price they were paid for their services. The claim that the boycott was (at least ultimately) motivated in any important way by a "political" concern—the quality of representation available to the indigent accused—should be treated with skepticism in light of the more obvious economic benefit to the participants.[29] Moreover, the contemporaneous record confirms that any political motive for the strike was distinctly secondary to the economic one; the SCTLA petition announcing the boycott, for example, asserted simply that "unless we are granted a substantial

increase in our hourly rate we will cease accepting new appointments under the Criminal Justice Act." No reference was made to the plight of their clients. A "press kit" prepared by SCTLA during the strike does include a statement arguing that the current rates are inconsistent with effective representation, but the dominant theme of these materials (the statement, a brochure from the Family Division Trial Lawyers Association, and several newspaper articles) is the trial lawyers' perception that they were underpaid. Nor were the boycotters much concerned with getting an increase in the per case ceiling, which would seem to be more directly related to the quality of the representation their clients received than the hourly rate. We also note that the sole issue raised by the boycott participants was compensation under the CJA; had the boycott been motivated primarily by concern with the quality of representation, the record would in all likelihood contain at least some other suggestions about how SCTLA thought that representation of indigent defendants could be improved.

Thus, without questioning the sincerity of the SCTLA members (and other knowledgeable but less interested witnesses) who testified about their concern for the quality of representation under the existing rates, we affirm the FTC's finding that the boycott was motivated primarily by economic self-interest. We recognize that a group boycott aimed at influencing the government may be motivated both by selfish and by selfless concerns, and that the two may be united even in a single participant. Accommodating the government's interest in regulating harmful economic activity to the right of its citizens to engage in joint political action requires us to determine which motivation predominates. As *Claiborne*

---

29. In fact, most commentators who have discussed an exemption from the Sherman Act for "non-commercial" or "political" boycotts have excluded from the scope of their analysis all boycotts organized by business competitors aimed at increasing their own profits. *See* Note, NOW *or Never: Is there Antitrust Liability for Noncommercial Boycotts?*, 80 Colum.L.Rev. 1317, 1319 & n. 16 (1980); Comment, *Protest Boycotts Under the Sherman Act*, 128 U.Pa.L. Rev. 1131, 1133 (1980); Note, *Political Boycott Activity and the First Amendment*, 91 Harv.L. Rev. 659, 660 (1978); *see also* Kennedy, *Political Boycotts, The Sherman Act, and the First Amendment*, 55 S.Cal.L.Rev. 983, 990 (1982) ("One important factor in properly characterizing a particular mixed-motive boycott is the presence or absence of economic gain flowing to the boycotters.").

*Hardware* illustrates, a boycott aimed at securing the civil rights of a minority does not lose its essentially "political" character merely because one of its goals—jobs in local stores—could improve the economic situation of some of the participants.[30] Similarly, a boycott organized by competitors in order to increase the price they get paid for their services does not lose its "economic" character solely because the service is purchased by the government and the quality of that service is (or perhaps more accurately, should be) a matter of public concern. *See Allied Tube,* 108 S.Ct. at 1938.

The economic motivation for the boycott leads us to conclude that it is most appropriately described as "commercial activity with a political impact." Accordingly, we reject petitioners' position that all non-violent boycotts aimed at influencing the legislative process are immune from the antitrust laws. It is neither required nor supported by the relevant decisions of the Supreme Court. Indeed, dicta in *Allied Tube* strongly suggests that *Noerr* does not extend to restraints indistinguishable from the one before us:

> We cannot agree with petitioner's absolutist position that the *Noerr* doctrine immunizes every concerted effort that is genuinely intended to influence governmental action. If all such conduct were immunized then, for example, competitors would be free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports. But see *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 456–463 [65 S.Ct. 716, 725–29, 89 L.Ed. 1051] (1945). Horizontal conspiracies or boycotts designed to exact higher prices or other economic advantages from the government would be immunized on the ground that they are genuinely intended to influence the government to agree to the conspirators' terms. But see *Georgia v. Evans,* 316 U.S. 159 [62 S.Ct. 972, 86 L.Ed. 1346] (1942). Firms could claim immunity for boycotts or horizontal output restrictions on the ground that they are intended to dramatize the plight of their industry and spur legislative action. Immunity might even be claimed for anticompetitive mergers on the theory that they give the merging corporations added political clout.

108 S.Ct. at 1938–39 (parallel citations omitted); *see also id.* at 1941 n. 10.

As this passage indicates, the anticompetitive implications of the petitioners' proposed extension of *Noerr* are far-reaching. More than one-fifth of the gross national product is purchased by government entities with money derived from legislative appropriations;[31] immunizing all non-violent boycotts aimed at affecting the legislative process would free the businesses that must now compete to supply this tremendous demand instead to "lobby" for increases in the prices they receive by collectively withholding production. Petitioners' suggestion that immunity be limited to those boycotts "designed to dramatize public issues" would offer little relief. The protectionist arguments that national security depends upon a domestic supply of boots and foodstuffs and everything else an army uses illustrates that virtually any industry could invoke an issue—perhaps its own welfare—that is, as petitioners' would require, "of interest to a broader group than the boycotters themselves." This is the stuff of which economic chaos is made in countries that tolerate coercive political action by industry, and from which the Sherman Act has shielded this country for almost a century.

## V.

▪ Our conclusion that such economic boycotts are not categorically immune from

---

30. Even this goal, which could be characterized as "economic" when viewed in isolation, is more appropriately viewed as part of a comprehensive effort to achieve racial equality in the public life of Claiborne County. By contrast, as noted above, SCTLA's demand for increased CJA fees was not part of a larger effort to focus attention on the quality of representation provided to indigent defendants or on the criminal justice system in the District of Columbia.

31. *See* U.S. Bureau of the Census, Statistical Abstract of the United States: 1988 at 410 (108th ed. 1987).

the antitrust laws, however, does not conclusively resolve the petitioners' claim that their specific boycott is entitled to First Amendment protection. While the state may legitimately regulate economic boycotts, the scope of its regulation must be limited lest the incidental restriction of the participants' First Amendment freedoms be greater than is essential to further the state's interest in maintaining competition. This First Amendment limitation on economic regulation, which was acknowledged in *Claiborne Hardware*, 458 U.S. at 912, 102 S.Ct. at 3425, derives from the Supreme Court's decision in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). That case concerned the government's authority to regulate expressive conduct in the context of a criminal prosecution for burning a draft card, but the Court laid down standards of far greater generality. The Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct," only a "sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." 391 U.S. at 376, 88 S.Ct. at 1678–79.

■ We think it clear that the SCTLA boycott did contain an element of expression warranting First Amendment protection.[32] We base this holding on "the nature of the appellant[s'] activity, combined with the factual context and environment in which it was undertaken." *Spence v. Washington*, 418 U.S. 405, 409–10, 94 S.Ct. 2727, 2729–30, 41 L.Ed.2d 842 (1974) (per curiam) (the display of a United States flag with a peace symbol attached to it is a form of protected expression). As for the "nature of the activity," we note that boycotts have historically been used as a dramatic means of communicating anger or disapproval and of mobilizing sympathy for the boycotters' cause. *See Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1050 (D.C.Cir.1981) (boycotts are "a staple of political, as well as economic, activity").

Moreover, the "factual context" of the SCTLA boycott suggests that the participants intended to communicate a message regarding the prevailing CJA rates and that this message was understood by others. Petitioners actively courted media coverage of their "strike" by handing out press kits and organizing picket lines and rallies. *See supra* at 230. The media responded with a number of newspaper articles and television stories that not only reported the boycott but also served to publicize the petitioners' claims that the prevailing CJA rates were inadequate.

Given that the First Amendment is implicated by aspects of the boycott, *O'Brien* provides that:

[A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial government interest; [3] if the government's interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679. Application of the first three parts of the *O'Brien* test poses few problems. No one seriously doubts that [1] antitrust laws lie within the constitutional power of Congress to regulate commerce, nor that [2] the government's interest in prohibiting restraints on competition is "important or substantial." *See United States v. Topco Associates*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed. 2d 515 (1972) ("[The antitrust laws] are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."). Petitioners have not suggested that this interest is in any way "related to" the suppression of free expression, or even that the Commission's decision to bring this case was inspired by hostility to the content of

---

**32.** The Commission did not address this question because it found that the policies underlying the federal antitrust laws (including the *per se* condemnation of price fixing boycotts) justified any incidental restriction on the petitioners' First Amendment freedoms. *See* 107 F.T.C. at 594–95.

the boycotters' speech about the inadequacy of the CJA rates.

In this context, however, *O'Brien* also requires that the restriction on expression be "no greater than is essential" to further the government's interest in protecting competition. The Commission argues that it has satisfied this part of the *O'Brien* test because it has left SCTLA and the· other petitioners free to continue speaking out collectively for legislative change, and prohibited only their agreeing collectively to surrender their trade freedom—*i.e.*, to renew the boycott. But since the boycott had an expressive side to it, this is a restraint on speech that can stand, per *O'Brien*, only if the Commission can show that it is essential in order to vindicate the policies of the antitrust laws.

In this regard, SCTLA challenges the Commission's failure to determine that the boycott participants had "market power," that is, the ability profitably to raise price. The market power requirement generally serves to ensure that the antitrust laws do not interfere with business arrangements that could not actually exert any detrimental effect on competition. The Commission did not inquire into SCTLA's market power insofar as it proceeded on a theory of *per se* illegality, of course, because the chief reason for the *per se* rule is to condemn price-fixing and kindred agreements among competitors without having to make potentially time-consuming and difficult factual determinations. *See Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). On the *per se* illegality of price fixing agreements, see *supra* at 237–38; *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986); *Socony–Vacuum Oil*, 310 U.S. at 224 n. 59, 60 S.Ct. at 845 n. 59 ("[A] conspiracy to fix prices violates § 1 of the Act though it is not established that the conspirators had the means available for accomplishment of their objective...."). Nor did the Commission look for market power when it analyzed the SCTLA boycott under the Rule of Reason; under that approach it was not necessary for it to proceed any further once it determined that there were no coun-

tervailing procompetitive justifications for the facially anticompetitive boycott.

The antitrust laws permit, but do not require, the condemnation of price fixing without proof of market power; even the *per se* rule, as the Commission acknowledges in its brief, is only a rule of "administrative convenience and efficiency," not a statutory command. FTC Brief at 39; *see Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 15 n. 25, 104 S.Ct. 1551, 1560 n. 25, 80 L.Ed.2d 2 (1984). While the rule may occasionally be overinclusive, condemning the ineffectual with the harmful, there is no known danger that socially beneficial arrangements will be prohibited, for price-fixing agreements rarely, if ever, have redeeming virtues. As for the hapless but harmless, as Professor Areeda has noted, defendants charged with conspiring to fix prices "have little moral standing to demand proof of power or effect when the most they can say for themselves is that they tried to harm the public but were mistaken in their ability to do so." VII P. AREEDA, ANTITRUST LAW ¶ 1509 at 411 (1986).

When the government seeks to regulate an economic boycott with an expressive component, however, its condemnation without proof that the boycott could in fact be antitcompetitive ignores the command of *O'Brien* that restrictions on activity protected by the First Amendment be *"no greater than is essential"* to preserve competition from the sclerotic effects of combination. *See also NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963) ("Broad prophylactic rules in the area of free expression are suspect."). The Commission suggests that we misread *O'Brien*, noting that the Court in that case upheld the government's restraint on the defendant's ability to express himself by burning his draft card, because draft cards are a "legitimate and substantial administrative aid in the functioning of [the registration] system." 391 U.S. at 377, 88 S.Ct. at 1679. Similarly, the government urges here, condemnation *per se*, without regard to market power, is a legitimate and substantial aid in the admin-

istration of the antitrust laws. True enough, and we do not say that administrative convenience may never justify an incidental restriction on expressive conduct; *O'Brien* is to the contrary in the context of Congress's effort to raise and maintain an army during a period of international conflict. We hold only that the evidentiary shortcut to antitrust condemnation without proof of market power is inappropriate as applied to a boycott that served, in part, to make a statement on a matter of public debate. *See In re Primus*, 436 U.S. 412, 434, 98 S.Ct. 1893, 1906, 56 L.Ed.2d 417 (1978) ("Where political expression or association is at issue, this Court has not tolerated the degree of imprecision that often characterizes government regulation of the conduct of commercial affairs.").

The Commission also argues that requiring a showing of market power in this case will effectively do away with *per se* analysis altogether, as if, in the somewhat hysterical terms argued to us, "price-fixing is to be deemed 'speech' merely because the price-fixers claim they must engage in such conduct in order to communicate effectively with their target...." This prophecy greatly overestimates the reach of our decision, as we suspect, from its placement in a footnote to its brief, the Commission fully understands. First, our determination that the SCTLA boycott contained an element of protected expression is not based simply on the petitioners' claim that they needed to engage in the boycott in order to communicate effectively; instead, it is based on the "factual context and environment" in which the boycott was undertaken, including the petitioners' active efforts to appeal to the public for support of their demand for a raise. In this regard, their boycott was like the "strike" they called it. Second, as noted above, our evaluation of the petitioners' conduct is not unaffected by the special concern of the First Amendment with efforts to petition the government for redress of one's grievances. Where the measure of this constitutional right is at stake, it is not too much of a burden on the government to require that it prove rather than presume that the evil against which the Sherman Act is directed looms in the conduct it condemns. This latter consideration obviously would not apply to a boycott directed against private participants in the market.

## VI.

Had the boycott participants market power? The Commission says they did, although it has never defined the relevant market or estimated the petitioners' share of it. Indeed, both petitioners and respondent suggest that the market power issue should be resolved in their favor on the basis of the existing record.

SCTLA's arguments warrant only a brief comment. It suggests that the dramatic increase in the number of lawyers volunteering to take CJA cases following the rate increase demonstrates that the boycotters had only very short-run market power, if they had any at all. The availability of alternative suppliers who will quickly substitute into a market or increase existing production in response to a small price increase is, of course, highly relevant to the question of market power. Suppliers that will so respond should be included in the definition of the market.[33] Other suppliers, that will respond only to a larger increase in price or that may take longer to enter, may nonetheless pose an important restraining effect on the exercise of power by market incumbents, and may also therefore be relevant in assessing the meaning of market shares. The facts concerning such new entry as occurred in the wake of the CJA increase are far from clear in the record before us, however, and they should in any event be evaluated in the first instance by the Commission.[34]

---

**33.** Both the magnitude of the price increase considered and the length of time allowed for new entry may vary depending on the reason the market is being defined. In the context of mergers, for example, the Department of Justice generally defines markets by examining the ef-

fect of a five percent price increase lasting one year. *See* U.S. Department of Justice, Merger Guidelines §§ 2.11, 2.2 (1984).

**34.** Contrary to SCTLA's suggestion, the record admits of starkly contrasting inferences. We note, for example, that the CJA attorneys re-

SCTLA also notes that the District had the option of persuading or forcing other attorneys to replace them. There are obvious drawbacks, however, to the government's use of its power to coerce certain citizens to provide their services to others. In fact, when CJA funds ran out in 1974, an attempt to conscript attorneys to represent indigent defendants encountered strenuous resistance. In any event, a group that engages in a supply disrupting boycott against the government should not ordinarily be permitted to defend against an antitrust suit on the ground that the government failed to use its extraordinary powers to relieve the economic pressure they had brought against it.

Without conceding the need to demonstrate market power, the Commission argues that its findings regarding the effect of the boycott are sufficient to show that petitioners had market power. The Commission's argument is based on *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), where the Supreme Court held that "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Id.* 106 S.Ct. at 2019 (quoting P. AREEDA, ANTITRUST LAW ¶ 1511 at 429 (1986)).

The "actual detrimental effects" cited by the Commission include its findings that the SCTLA boycott "dramatically reduced the supply of lawyers to the city's CJA program"; "adversely affected the city's ability to meet its constitutional obligation to provide counsel for indigent defendants"; and "forced the city government to increase the CJA fees from a level that had been sufficient to obtain an adequate supply of CJA lawyers to a level satisfactory to the [petitioners]." 107 F.T.C. at 577. We agree that in the typical commercial context, these findings would generally be more than sufficient support for the conclusion that an arrangement had an actual detrimental effect on competition. The normal assumptions regarding cause and effect in an economic market cannot be transplanted wholesale into the political arena, however. There are reasons to pause before inferring market power from detrimental effects when political power may be the more explanatory variable.

Power of some sort was surely exercised: The city council approved a CJA rate increase it had long refused, two weeks into a boycott that disrupted the court system and generated significant publicity. Perhaps the rate increase would have followed just as swiftly if the boycotters had simply stopped accepting appointments, exerting their raw market power under a shroud of conspiratorial silence. But it is also possible that, lacking any market power, petitioners procured a rate increase by changing public attitudes through the publicity attending the boycott. The boycott may have engendered significant public pressure; the ALJ found it did not, but the Commission did not reach the question and rejected the ALJ's findings except insofar as it expressly adopted them. *See* I.D.F. 58; 107 F.T.C. at 563 n. 4. Or the publicity surrounding the boycott may have served only to dissipate any public opposition that a substantial raise for lawyers who represent indigent defendants had previously encountered.[35]

ceived a rate increase of 75% for out-of-court time and of 17% for in-court time, substantially above the 5% increase generally used by the Department of Justice in defining markets under the merger guidelines. *See supra* n. 33. In addition, the assumption that production substitution serves as a check on market power may be problematic when the price is set through legislation. As petitioners have repeatedly noted, legislatively determined prices tend to be "sticky" so that an increase in supply caused by

a rise in price is unlikely to restore the market to the competitive equilibrium, *i.e.*, to a lower price. Thus, post-increase entry may only reflect the availability of supra-competitive returns for new entrants, resulting in rationing of cases to lawyers.

**35.** The record demonstrates that Mayor Barry and other important city officials were sympathetic to the boycotters' goals and may even have been supportive of the boycott itself. *See*

Even if one were to conclude that the city increased the rates solely as a response to the decrease in supply of attorneys willing to accept CJA appointments, it still would not follow without more that the petitioners had market power. The reduced supply of lawyers to take CJA cases would reflect an economic distinction between the CJA market and the other markets for lawyers' services, which would support the market power hypothesis, or it could instead reflect the success of SCTLA's persuasive campaign among other lawyers who were in the same market but were also in political sympathy with them. The ALJ specifically found that the "feeble" response of the "uptown" lawyers to the PDS's call for help was due, in part, to "their underlying support for the demands of the CJA lawyers." I.D.F. 60. Again, however, the Commission did not pass upon the point, and did not adopt the relevant finding.

Given such inherent difficulties in inferring market power from the "effects" of the petitioners' boycott, the Commission may need to examine structural evidence to determine the degree of market power, if any, that petitioner wielded. This will require that the Commission define a relevant "market" that includes all services that are effective substitutes for the petitioners' services and are likely to be available within a reasonable time. The significance of petitioners' share of the market thus defined can then be assessed in light of other factors relevant to the exercise of market power.

The form that its "market power" inquiry should take on remand is an issue that is best left to the Commission's expert

judgment. In particular, we do not mean to suggest that the exhaustive and time consuming market definition exercise that is endemic to merger litigation is necessary or desirable in this context; if the Commission has a better approach, it should use it. Nor are we unaware of the irony of our remitting the Commission to evidence of market structure in a case where it can point to evidence of actual effects from the boycott. Structural evidence is indirect and thus inferior to direct evidence of market power, but it is the best available evidence in most cases affecting market structure, such as merger cases. In cases involving allegedly anticompetitive conduct on the other hand, the Commission would not normally concern itself with issues of market definition, market share, and the inferences to be drawn therefrom. As we have seen, however, on the peculiar facts of this case, which are unlike those in *Indiana Federation of Dentists*, "proof of actual detrimental effects, such as reduction of output," cannot "obviate the need for an inquiry into market power," unless the court can with confidence reject the possibility that the effects were the product simply of the rough and tumble of municipal politics. If the FTC can make that showing, of course, then it need not rely on structural market evidence after all.

■ If the Commission determines that petitioners have significant market power, it will need to determine also how much market power is sufficient to justify the condemnation of an expressive boycott. This is apparently a matter of first impression. Clearly, the First Amendment con-

I.D.F. 37, 38, 43, 45, 50, 63; 107 F.T.C. at 560. At a meeting on August 29, 1983, for example, Mayor Barry, who was aware of the September 6 strike deadline, explained the District's emergency legislative process to SCTLA representatives and told them "[y]ou do what you have to do, and I will do what I have to do." *See* I.D.F. 50. Indeed, the ALJ concluded that "the Mayor ... believed that an increase was fully merited but could not be brought about unless the city was confronted with an actual emergency demonstrating the importance of the CJA lawyers to the administration of the criminal justice system." 107 F.T.C. at 559. We agree with the

Commission that the Mayor's "knowing wink" cannot confer immunity on the petitioners if they did, in fact, have market power that they exercised to the detriment of the city. *See Socony Vacuum Oil*, 310 U.S. at 226, 60 S.Ct. at 846. Nonetheless, the mayor's remarks could also be interpreted as encouraging the petitioners to stage a demonstration of their political muscle so that a rate increase could more easily be justified to the public. Such a demonstration would not offend the antitrust laws if the petitioners actually lacked the ability to exert any significant economic pressure on the city.

cerns implicated by expressive boycotts require that they not be condemned if their ability to harm competition is insignificant. Only an expressive boycott that poses a significant threat to competition warrants condemnation under the antitrust laws, as an "unreasonable restraint of trade."

We recognize, of course, that even proof that the petitioners have significant market power does not conclusively demonstrate that their boycott succeeded because it was coercive rather than persuasive. Balanced against petitioners' First Amendment rights to speak and to petition the government, however, is the need to protect that government, as a purchaser, from the economic pressure of suppliers acting in concert. The approach we have outlined today is intended to afford government the protection of the Sherman Act without infringing to any avoidable degree upon the First Amendment rights of those whose petition for redress goes beyond pure speech to take the form of a boycott.

### VII.

We therefore vacate the order entered by the Commission and remand the case for further proceedings consistent with this opinion. In view of this disposition, we need not now consider the petitioners' contention that the Commission's order is overly broad and not reasonably related to the remedial purposes of the Act. Accordingly, the petition for review is granted in part and denied in part.

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I concur fully in the court's comprehensive opinion, except for its reliance on the Trial Lawyer's commercial motivation. I think it fair to say that, at a minimum, their motivation was mixed, and I do not think it necessary or desirable in this case to determine which of the two impulses predominates. Rather, it is my view that the Supreme Court's cases hold that certain techniques traditionally proscribed may themselves be used to characterize conduct as commercial rather than political regard-

less of the actor's motivation, and that the FTC's task is to determine whether such a technique has been employed.

I agree with the majority that observing that SCTLA set out to influence governmental activity hardly completes the analysis. A supplier to government that uses its market power to influence the government to pay a higher price for goods could have no claim to antitrust immunity. *See* Maj. op. at 250–51; I P. AREEDA & D. TURNER, ANTITRUST LAW ¶ 206 (1978). On the other hand, members of an industry that engaged in a successful letter writing campaign to influence government to pass legislation effectively increasing their profit margins would have taken part in protected political activity. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The difficulty in this case, where petitioners directed at government a boycott—which could be either expressive or coercive—is determining whether they in fact prevailed because of political appeal or commercial might.

I do not believe the answer lies in the majority's analysis of petitioners' subjective motivation, nor that the Supreme Court's cases compel that sort of examination. *Allied Tube* does draw a distinction between commercial activity with political impact and political activity with commercial impact. 108 S.Ct. at 1941. The majority at 249–50, however, appears to equate political activity with altruism, requiring that petitioners have the Sixth Amendment interests of their clients primarily in mind if they are successfully to claim they are engaging in political speech. The setting of reimbursement levels for publicly appointed defense counsel is a political issue, though, and petitioners' self-interest does not strip their speech of its political character. The activity held to be protected in *Noerr* was designed to harm truckers and help the railroads. 365 U.S. at 142–44, 81 S.Ct. at 532–33; *see also United Mine Workers v. Pennington*, 381 U.S. 657, 667–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965). Similarly, the Court in *Allied Tube* acknowledged that lobbying to remove

the "competitive threat" of polyvinyl chloride conduit could be protected, 108 S.Ct. at 1942, and even the boycotters in *Claiborne Hardware,* from which the majority draws the motivation test, were obviously seeking legislation beneficial to them. *See* 458 U.S. at 899, 935 (app.), 102 S.Ct. at 3418, 3437 (app.).

The difficulty with the motivation test as the majority uses it is sharply illustrated by comparing *Claiborne Hardware* with *International Longshoremen's Association v. Allied International, Inc.,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982) ("*ILA* "). Both cases involved boycotts of private commercial enterprises in order to bring political pressure—the longshoremen were protesting the Soviet invasion of Afghanistan while the boycotters in *Claiborne Hardware* sought to vindicate certain Fourteenth Amendment rights. Yet the *Claiborne Hardware* boycott's nonviolent elements were held to be protected by the First Amendment, while the longshoremen's First Amendment claims were dismissed in a brief paragraph, *id.* at 226–27, 102 S.Ct. at 1664–65, despite the apparent acceptance by the Court of the purely political motivation of the boycott, *see id.* at 222–26, 102 S.Ct. at 1662–64. Motivation then, in the sense of the absence of desire for personal enrichment, cannot be the determinant of what speech is protected as political. If it were—since we all act with some attention to our economic interests— *Noerr* immunity could seldom be invoked.

To be sure, *Claiborne Hardware* emphasized that the boycotters' purpose was to "influence government action," 458 U.S. at 914, 102 S.Ct. at 3426, and in *Allied Tube* the Court, in referring to *Claiborne Hardware,* described the boycotters' motivation as lacking any "desire to lessen competition or to reap economic benefits," 108 S.Ct. at 1941. But I think it is more telling that the *Claiborne Hardware* Court distinguished *Noerr* because, unlike the railroads, the

*Claiborne Hardware* boycotters, although injuring private parties, did not aim at destroying "legitimate competition," 458 U.S. at 914, 102 S.Ct. at 3426, and that in *Allied Tube* the Court observed "the boycotters were consumers who did not *stand* to profit financially from a lessening of competition in the boycotted market." 108 S.Ct. at 1941 (emphasis added). In other words, regardless of the boycotters' exact psychological motivation, they were not using a technique that is generally thought to work market injury, so the activity can be characterized as political.

I think the proper distinction between political and commercial activity must in cases such as this one—where the objective is the same (raising rates) regardless of the originating considerations—turn on the *means employed* in eliciting a governmental response. As I said at the outset, if one gets one's way from the government *qua* legislator because of political persuasiveness, there is no liability. But using market power to coerce the government *qua* economic actor creates a distortion of the market and the political process. Since a boycott has the potential either to persuade or to coerce, however, the only proxy we have for whether SCTLA relied on political or commercial power, the crucial element of the "context and nature," *Allied Tube,* 108 S.Ct. at 1942, of this case, is the degree of market power they enjoy. If they have none, the boycott must have succeeded out of persuasion and been a political activity. But if there is market power, one must assume, for antitrust purposes, it came into play and that the boycott was primarily commercial.

I think this approach offers a reconciliation of *Claiborne Hardware* and *ILA,* holdings which surely cannot be satisfactorily explained in terms of the Supreme Court's policy views of the political objectives advanced.[1] The *ILA* Court called that boycott "conduct designed not to communicate

---

[1] It is true that the *Claiborne Hardware* Court described the boycotters as seeking "to effectuate rights guaranteed by the Constitution itself," 458 U.S. at 914, 102 S.Ct. at 3426, and juxtaposed that objection against only the right of the states to regulate economic activity. This might suggest that the Court would give greater deference to federal regulation in drawing the appropriate balance with the First Amendment. Nevertheless, *Claiborne Hardware* does not appear to me to be limited to boycotts that protest unconstitutional practices.

but to *coerce.*" 456 U.S. at 226, 102 S.Ct. at 1665 (emphasis added). It appears the Court was troubled by the longshoremen's use of the traditionally prohibited secondary boycott, *see* 456 U.S. at 224, 102 S.Ct. at 1663, but not with the ability of the *Claiborne Hardware* petitioners actually to reduce competition in the market for groceries and reap that benefit. Similarly, the Court in *Allied Tube* emphasized that the standard-setting process there "involve[d] the exercise of market power." 108 S.Ct. at 1941. If the *Claiborne Hardware* boycotters had put forth the same demands but, rather than consumers, had been the only three suppliers of electricity to the government or to private users, I think it likely the Court would have focused its analysis more clearly on factors such as available alternative power sources —in short, the indicia of market power.

I therefore agree with the majority that the FTC must inquire into market power. A boycott *is* the sort of activity "normally held violative of the Sherman Act," *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529, but if it has a communicative element and is undertaken without market power, it cannot be a primarily commercial activity.